529 So.2d 1309 (1988)
Beverly BLANCHARD, et al.
v.
OUR LADY OF THE LAKE MEDICAL CENTER, et al.
No. CA 87 0636.
Court of Appeal of Louisiana, First Circuit.
July 21, 1988.
Writ Denied November 11, 1988.
*1310 Michael Matthews, Gonzales, for plaintiff-appellant Beverly Blanchard and Ann Blanchard, Individually and on behalf of their deceased son, Todd Blanchard and also Marlene Blanchard, Kent Blanchard, Timothy Blanchard, Lyle Blanchard, Chad Blanchard, and Nanette Blanchard Individually and on behalf of their deceased brother, Todd Blanchard.
Donald Zuber, Baton Rouge, for defendant-appellee Dr. William Lee, Dr. Leo Farmer, Dr. Donald Cowick & St. Paul Fire & Marine Ins. Co.
Before COVINGTON, SAVOIE and LeBLANC, JJ.
LeBLANC, Judge.
This suit was brought by Beverly Blanchard and his wife, Ann Blanchard, for the alleged wrongful death of their son, Todd Blanchard. His death was allegedly caused by negligent medical treatment administered to him after he was injured in an automobile accident. The suit was brought against Dr. William Chapman Lee, Dr. Don R. Cowick, Dr. Leo A. Farmer and Farmer, Cowick and Lee Ltd., the doctor's medical corporation. Suit was also filed against St. Paul Insurance Company, insurer of Drs. Lee, Cowick, Farmer and the medical corporation.[1] The matter was tried before a jury. At the close of plaintiffs' case-in-chief, defendants moved for a directed verdict. The trial judge granted the motion in favor of Dr. Cowick and Dr. Farmer, only. The trial proceeded and the jury returned a verdict, finding that Dr. Lee was not negligent in his treatment of Todd Blanchard. Accordingly, the trial judge rendered judgment in favor of the defendants. Plaintiffs appeal.
On December 9, 1978, Todd Blanchard (hereinafter referred to as Mr. Blanchard), was admitted to a hospital emergency room for the treatment of facial lacerations resulting from an automobile accident. Following complaints of abdominal pain by Mr. Blanchard, Dr. Lee examined Mr. Blanchard *1311 and recommended exploratory surgery. The surgery, which was performed by Dr. Lee, revealed a laceration of the left lobe of the liver, a crush injury to the pancreas and a large hematoma across the body of the pancreas. The liver injury was sutured and surgical drains were placed in the areas of the liver and the pancreas. Due to subsequent abdominal complications, three follow-up surgical procedures were performed on Mr. Blanchard by Dr. Lee during December of 1978 and the early part of January of 1979. These surgeries involved treatment of pancreatic abscesses and a colostomy. On January 26, 1979, Mr. Blanchard suffered a respiratory arrest. Although he was revived from the respiratory arrest, he died a few hours later. An autopsy revealed the cause of death to be a pulmonary embolus that lodged in the main pulmonary artery.
On appeal, plaintiffs assert two assignments of error:
1. The trial court committed reversible error in granting the motion for a directed verdict in favor of Dr. Farmer and Dr. Cowick.
2. The jury was manifestly erroneous in finding that Dr. Lee was not negligent in his treatment and care of Mr. Blanchard.
We find that the trial court abused its discretion in granting the motion for a directed verdict in favor of Dr. Farmer and Dr. Cowick. Although a trial court has much discretion in deciding whether or not to grant a motion for a directed verdict pursuant to La.Code Civ.P. art. 1810, the court should consider all of the evidence in the light most favorable to the party opposing the motion. "A court should not grant the motion unless the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable minds could not arrive at a contrary conclusion." Collett v. Branch, 516 So.2d 450, 452 (La. App. 1st Cir.1987).
In the present case, plaintiffs attempted to prove that Drs. Lee, Farmer and Cowick were negligent in their medical treatment of Mr. Blanchard, which included four surgical procedures and care following these surgeries. Plaintiff presented the expert testimony of Dr. Bruce V. MacFadyen, Jr., a general surgeon, who testified that Mr. Blanchard did not receive adequate nutritional support during his hospital stay. He explained that by the date of the second surgery, December 18, 1978, Mr. Blanchard should have been given hyperalimentation, a method of providing nutrition intravenously. (Dr. Lee's testimony on cross-examination, established that Mr. Blanchard was not given hyperalimentation until January 7, 1979.) Dr. MacFadyen testified that if Mr. Blanchard had received proper nutritional support he would probably not have been malnourished and that proper nourishment would have increased Mr. Blanchard's prospects for living. Dr. MacFadyen testified that Mr. Blanchard could not exercise because he was so malnourished. He explained that malnutrition causes a person to be weak, tired and rundown. He further testified that the pulmonary embolus which caused Mr. Blanchard's death probably resulted from Mr. Blanchard's inactivity.
Dr. MacFadyen also testified that prophylactic antibiotics should have been administered to Mr. Blanchard throughout his medical treatment starting on December 9, 1978, the date of his first operation. He explained that the antibiotics were necessary to control the infection that was present in the area of the pancreas. (Dr. Lee's testimony on cross-examination established that antibiotics were prescribed for Mr. Blanchard on December 15, 1978.)
Dr. MacFadyen further testified that, based on the pathologist's gross provisional diagnosis in the autopsy report which indicated that the proximal body of the pancreas was partially transected, a resection of the pancreas probably should have been performed at the time of the third surgical procedure, January 5, 1979. He explained that the resection was needed in order to control the flow of pancreatic juices and to control the infection of the pancreas.
*1312 Dr. MacFadyen also stated that it is more probable than not that Mr. Blanchard would have lived if the problem of the transection of the pancreas would have been properly identified and treated and if the antibiotics would have been timely administered after the first surgery.
Defense counsel contends that the directed verdict in favor of Dr. Farmer and Dr. Cowick was proper because plaintiffs' case-in-chief included very little testimony which made reference to these two doctors and this testimony did not establish that these two doctors were significantly involved in the treatment of Mr. Blanchard. Defense counsel argues that the testimony which described the three doctors' medical relationship as a "team", which may have warranted the imposition of joint liability on the three doctors, was presented during defendants' case-in-chief and should not be considered in determining whether the directed verdict was properly granted.
We find that the testimony presented in plaintiffs' case-in-chief included evidence from which the jury could have inferred that each of the three doctors, Dr. Lee, Dr. Farmer and Dr. Cowick, had the authority to administer medical treatment to Mr. Blanchard. As the admitting physician and the physician who performed the surgical procedures on Mr. Blanchard, Dr. Lee clearly had authority to treat Mr. Blanchard. On cross-examination during plaintiffs case-in-chief, Dr. Lee referred to orders in Mr. Blanchard's medical records that were made by both Dr. Farmer and Dr. Cowick. Dr. Farmer ordered the prophylactic antiobiotics on December 15, 1978 and later ordered some tests to be run on Mr. Blanchard. Dr. Cowick ordered the intravenous hyperalimentation on January 7, 1979, and also ordered that the patient be weighed on one occasion. Also, Dr. Lee's testimony indicated that both Dr. Farmer and Dr. Cowick made comments in the hospital charts regarding the patient's progress during December of 1978. Furthermore, when Dr. Lee was questioned about why he did not make the order for the hyperalimentation, he explained that he did not make the order because Dr. Cowick had issued the order. He also made the comment, "We're a team".
In addition to Dr. Lee's testimony, Mrs. Blanchard's testimony presented in plaintiffs' case-in-chief, described the relationship between the three doctors. She explained that she was aware that the three doctors practiced medicine together and that each of the three doctors treated her son while he was hospitalized. However, Mrs. Blanchard's testimony and the testimony of Dr. Farmer established that Dr. Farmer was not involved in the medical care of Todd Blanchard subsequent to January 2, 1979.
Viewing Dr. MacFadyen's testimony, together with the testimony of Dr. Lee and Mrs. Blanchard, we find that the facts and inferences did not point so strongly to a conclusion of no liability on the part of Dr. Farmer and Dr. Cowick as to warrant a directed verdict on this issue. Based on the testimony of Dr. MacFadyen, the jury could have determined that Dr. Cowick was negligent in not ordering the hyperalimentation treatment at an earlier date and that Dr. Farmer was negligent in not ordering the antibiotics at an earlier date. Also, based on the testimony of Dr. Lee, Dr. Farmer and Mrs. Blanchard, the jury could have inferred that Dr. Farmer and Dr. Cowick had the authority to make these orders at an earlier date. Furthermore, after hearing Dr. MacFadyen's testimony, the jury could have determined that the failure to timely administer the hyperalimentation treatment and the antibiotics was a contributing cause of Mr. Blanchard's death.
The granting of the defendants' motion for a directed verdict in this case was also improper because the motion was not made at an appropriate time. "A motion for a directed verdict may be made either at the close of the plaintiff's case or at the close of all of the evidence, but may not be made at points in between." Collett v. Branch, 516 So.2d at 452. In this case, the *1313 plaintiff allowed defendant to put on the testimony of three witnesses out of turn, prior to resting his case-in-chief. The motion for a directed verdict should not have been addressed at this time.
For these reasons, the decision of the trial court granting the defendants' motion for a directed verdict is reversed.
Plaintiffs also contend that the directed verdict rendered in favor of Dr. Farmer and Dr. Cowick caused the jury to be prejudiced in determining whether Dr. Lee was negligent since the jury was presented with evidence that explained that the doctors worked as a team. Thus, plaintiffs argue that the jury verdict in favor of Dr. Lee should also be vacated.
We find no merit in plaintiffs' argument that the jury's verdict was influenced by the directed verdict. After the trial court granted the motion for the directed verdict, the trial court informed the jury that Dr. Cowick and Dr. Farmer were no longer defendants in the lawsuit. The court did not give any explanation regarding why these doctors were no longer involved in the litigation. The trial judge acted properly in not explaining to the jury his decision to grant the directed verdict. The record does not establish that the granting of the directed verdict in favor of Dr. Farmer and Dr. Cowick presented an adverse inference to the jury. In fact, the directed verdict in favor of two of the doctors may have even created an inference to plaintiffs' advantage; the jury could have inferred that since Dr. Lee was still a defendant in the suit that there must have been some basis for his liability.
Since we find the jury was not improperly influenced by the directed verdict, we must now address plaintiffs' argument that the jury was manifestly erroneous in finding that Dr. Lee was not negligent in his treatment and care of Mr. Blanchard. Plaintiffs argue, pursuant to La.R.S. 9:2794, that Dr. Lee failed to use reasonable care and diligence along with his best judgment in the treatment of Todd Blanchard as required by the degree of care ordinarily practiced by physicians in the specialty of general surgery. Plaintiffs contend that they have shown by a preponderance of the evidence that Dr. Lee did not use reasonable care by (1) failing to conduct a pancreatic resection in the initial as well as subsequent surgeries, (2) failing to provide Mr. Blanchard with proper nutritional support, (3) failing to provide the necessary medication or exercise to prevent a pulmonary embolus, and, (4) failing to correctly diagnose and treat the pulmonary embolus.
Regarding the treatment of the pancreas, Dr. Lee performed four exploratory surgeries. During the first three surgeries, he placed sump drains in the area of the pancreas in order to treat infection of the pancreas. During the fourth surgery, he performed a colostomy in order to repair damage to the colon.
Plaintiffs' expert, Dr. MacFadyen, testified that a resection of the pancreas probably should have been performed at the time of the third surgery in order to gain control of the infection of the pancreas. His opinion was based on the continuing infection in the area of the pancreas and the pathologist's gross provisional diagnosis in the autopsy report which indicated that the proximal body of the pancreas was partially transected.
However, Dr. Lee testified that he carefully examined the pancreas and found no transection of the major duct of the pancreas. He explained that there is no need for a resection of the pancreas unless there is a major ductile injury. He testified that the standard medical teaching indicates that drainage and debridement is the proper treatment for pancreatic injuries when there is no transection of the major duct of the pancreas.
One of defendant's expert witnesses, Dr. Francis C. Nance, a professor of surgery, testified that Dr. Lee did not deviate from the standard of care of general surgeons in his treatment of Mr. Blanchard. More specifically, Dr. Nance testified that Dr. Lee's *1314 treatment of the pancreas was proper by general standards of medical teaching and that a resection of the pancreas was not indicated at any time during Mr. Blanchard's care. He explained that the performance of three or four operations to treat this type of infection is not unusual. He also pointed out that the autopsy report revealed that there was no infection in Mr. Blanchard's stomach at the time of his death. In his opinion, this fact established that Dr. Lee's treatment of the pancreas was effective.
In addition, Dr. Marvin E. Stuckey, who performed the autopsy on Mr. Blanchard, testified that the autopsy did not reveal a transection of the pancreas. He explained that he should have used the term "injury" or "suspected laceration" in his gross provisional diagnosis rather than the term "transection".
The jury determined that Dr. Lee did not lack the degree of knowledge or skill ordinarily exercised by physicians practicing in his specialty, or fail to use reasonable care and diligence along with his best judgment in the application of that skill. Based on this finding, we determine that the jury implicitly found that Dr. Lee was not negligent in failing to perform a pancreatic resection. We cannot say that this finding was manifestly erroneous, based on the testimony presented regarding this issue.
Plaintiffs next contend that Dr. Lee did not use reasonable care because he failed to provide proper nutritional support to Todd Blanchard. In support of this contention, Dr. MacFadyen testified that Mr. Blanchard became malnourished during his hospital stay and that hyperalimentation nutritional support should have been administered to Mr. Blanchard by the date of his second surgery, December 18, 1978. Although hyperalimentation was given to Mr. Blanchard starting on January 7, 1979, Dr. MacFadyen testified that the amount of calories being provided by the hyperalimentation was insufficient. He stated that it is possible to give proper nutritional support to a patient who suffers from an infection around the pancreas. Dr. MacFadyen testified that if Mr. Blanchard had received proper nutritional support, he would probably not have been malnourished and his chances for living would have been increased. He explained that if Mr. Blanchard would have been strong enough to ambulate, the pulmonary embolus probably would not have developed.
Dr. Lee defended his action of not beginning the hyperalimentation treatment until January 7, 1979. In his opinion, the disadvantages of instituting hyperalimentation outweighed the advantages prior to this date. He explained that a major complication of hyperalimentation is infection. He also explained that it is unclear whether a septic patient, someone who suffers from an infection, can benefit from hyperalimentation. Dr. Lee stated that according to the standard in the community at the time he was treating Mr. Blanchard, hyperalimentation was considered to be contraindicated in septic patients.
In respect to the amount of calories provided by the hyperalimentation, Dr. Lee explained that he started with 2000 calories a day to determine if Mr. Blanchard could tolerate the additional sugar. On the fourth day of the treatment, the hyperalimentation was increased to 3000 calories a day. He testified that he did not increase the amount of calories again because there was no indication that an increase would have been helpful to Mr. Blanchard's condition.
According to the testimony of Dr. Nance, the use of hyperalimentation was rather unusual in 1979. The technique was not routinely used because the necessary technology was not universally available. Dr. Nance also confirmed Dr. Lee's testimony regarding the dangers associated with the use of hyperalimentation. He testified that there are a number of serious complications associated with hyperalimentation, one being a great incidence of infections. He explained that the procedure is used with caution. Dr. Nance testified that if he had been treating Mr. Blanchard, he would *1315 have started the hyperalimentation treatment on approximately the same date on which the treatment was actually begun. He also stated that the two thousand calorie dose, on which Mr. Blanchard was started, was appropriate.
Dr. Millard E. Byrd, an expert in the field of general surgery, also testified on Dr. Lee's behalf. He testified that the use of hyperalimentation in Mr. Blanchard's medical treatment met the general standards of care in the medical community during 1979. Dr. Byrd testified that he would not have used hyperalimentation on a person with an infection at that time. He considered the technique of hyperalimentation to be dangerous, especially for a patient with an infection.
Even though the testimony regarding the proper use of hyperalimentation is conflicting, we find there is sufficient evidence in the record to support the jury's implicit finding that Dr. Lee was not negligent in his treatment of Mr. Blanchard with respect to the use of nutritional support.
Plaintiffs further allege that Dr. Lee did not use reasonable care because he failed to provide the necessary medication or exercise to prevent a pulmonary embolus. Regarding the prescription of medication, Dr. Lee testified that if he had known that Mr. Blanchard had an embolus, he would have prescribed heparin, a blood thinner used to prevent blood clots, after Mr. Blanchard suffered the respiratory arrest. However, he explained that he had not diagnosed an embolus. According to Dr. Lee's testimony, since there was no diagnosis of an embolus, the administration of heparin was not indicated because Mr. Blanchard had bled severely two weeks before the time he suffered the respiratory arrest and also because the patient was ambulatory. He also stated that the insertion of a vena cava umbrella after the respiratory arrest would not have helped because the embolus had already gotten loose. Dr. Lee also testified that an angiogram would have diagnosed the embolus, but that an angiogram was not performed because there were no indications that Mr. Blanchard was suffering from an embolus.
Dr. MacFadyen testified that a diagnosis of a pulmonary embolus should have been considered, based on the patient's symptoms. He also stated that heparin would be one of the mainstays of the treatment of someone with a blood clot. However, Dr. MacFadyen also stated that since heparin is a blood thinner, a physician might be reluctant to consider the use of heparin for a patient who has a history of bleeding. He further stated that a reluctance to use heparin when there is no definite diagnosis of a pulmonary embolus is reasonable.
Pertaining to the allegation that Dr. Lee did not provide Mr. Blanchard with sufficient exercise to prevent a pulmonary embolism, Dr. MacFadyen testified that Mr. Blanchard's pulmonary embolus probably resulted from him being constantly in bed and being inactive. Dr. MacFadyen stated that Mr. Blanchard's inactivity probably caused a lack of good blood flow through the veins in his lower extremities. He also testified that a primary measure to protect against a pulmonary embolism is to make the patient exercise. He explained that the best form of exercise is ambulation but that if a person is bedridden, exercises can be performed while the patient is in bed. Dr. MacFadyen also stated that if a physician writes an order for his patient to be exercised, the physician is responsible for verifying that his orders are performed by the hospital nurses.
Dr. Nance testified that ninety-nine (99%) percent of patients who ambulate four times a day do not develop an embolism. However, he also stated that ninety-nine percent of patients who do not exercise do not die of a pulmonary embolism. Dr. Nance also enumerated reasons for not ambulating a patient: the patient may not feel well enough to ambulate; if the patient has recently taken pain medication or had blood drawn, ambulation could be dangerous; the patient may have too many IV tubes attached to his body to be able to ambulate.
Dr. Lee confirmed that on January 2, 1979, he ordered the nurses to ambulate *1316 Mr. Blanchard four times each day. However, Marlene Blanchard, a registered medical record administrator, testified that Mr. Blanchard's medical records indicate he was not ambulated four times a day subsequent to January 2, 1979. However, the records do refer to Mr. Blanchard getting out of bed, standing without assistance, being repositioned in his bed and performing leg exercises on several dates subsequent to January 2, 1979.
Dr. Lee was questioned regarding whether he had followed up his orders to determine if Mr. Blanchard was being exercised. He testified that he checked the records to see if the nurses followed his orders to the best of his ability. He stated that he had personally recorded notes indicating that Mr. Blanchard was standing up and walking around. He said he did not know exactly how many times each day that Mr. Blanchard was ambulated, but in his opinion the nursing staff exercised Mr. Blanchard to the best of their ability. He explained that the nurses' control of the amount of exercise that Mr. Blanchard received was limited by the confines of Mr. Blanchard's illness. Dr. Lee stressed that Mr. Blanchard was very weak during most of the time subsequent to January 2, 1979 and before his death, due to the number of operations that he had undergone. The record also establishes that Mr. Blanchard was a patient in the intensive care unit and the intermediate care unit during a substantial part of this time period. Dr. Lee testified that getting Mr. Blanchard out of bed once a day or merely performing bed exercises was probably the most activity that Mr. Blanchard could perform.
In addition, Dr. Lee testified that his orders to have Mr. Blanchard ambulated four times a day, which were made on January 2, 1979, were discontinued on January 5, 1979, when Mr. Blanchard underwent one of his surgeries. He explained that he did not issue new orders for exercise of Mr. Blanchard because he was aware of the types of exercises that were routinely performed in the intensive care unit. Dr. Lee stated that the nurses' notes that were prepared during Mr. Blanchard's care in the intensive care unit and intermediate care unit establish that Mr. Blanchard was repositioned on many occasions and that leg exercises were performed on multiple occasions.
Based on the jury's general finding that Dr. Lee did not fail to use reasonable care in his treatment of Mr. Blanchard, we find that the jury implicitly found that Dr. Lee's action of failing to prescribe medication to prevent a pulmonary embolus was reasonable and Dr. Lee's actions with respect to the exercise that Mr. Blanchard received was reasonable. The relevant testimony establishes that the jury's findings are not manifestly erroneous.
Plaintiffs also claim that Dr. Lee's care of Mr. Blanchard was unreasonable because he failed to correctly diagnose and treat the pulmonary embolus which caused Mr. Blanchard's death. In reference to this claim, Dr. Lee testified that after Mr. Blanchard was revived from the respiratory arrest, Mr. Blanchard's blood gases were checked. He described the test results as normal and an indication that Mr. Blanchard's lungs were ventilating nicely. He said that normal blood gases do not rule out an embolus but it certainly makes one less likely. According to Dr. Lee, other tests of Mr. Blanchard's blood sugar and sodium count indicated that Mr. Blanchard was suffering from hyperasmolar dehydration, a possible side-effect of hyperalimentation. Dr. Lee explained that Mr. Blanchard was properly treated for this condition. Dr. Lee testified that he did not perform any test to check for blood clots because there were no clinical indications of a blood clot. As summarized above, since there was no diagnosis of a blood clot, Dr. Lee did not prescribe any blood thinning medications because of Mr. Blanchard's history of bleeding.
When questioned about the cause of Mr. Blanchard's respiratory arrest, Dr. MacFadyen stated that he thought a diagnosis of a blood clot should have been considered *1317 due to the decrease in Mr. Blanchard's blood pressure during the respiratory arrest. Dr. MacFadyen explained that if a diagnosis of a blood clot had been made, it may have been possible to remove the blood clot by performing a cardiopulmonary bypass.
Dr. Nance testified that he could not criticize Dr. Lee for failing to diagnose the pulmonary embolus. He explained that Mr. Blanchard's symptoms indicated that he was suffering from hyperasmolar dehydration and that the treatment that Dr. Lee administered to Mr. Blanchard was the proper treatment for this condition. Dr. Nance further testified that even if a diagnosis of the pulmonary embolism had been made after Mr. Blanchard's respiratory arrest, there would not have been sufficient time to organize a cardiac team to perform surgery on Mr. Blanchard before his death.
The testimony of Dr. Byrd confirmed Dr. Nance's opinion. Dr. Byrd testified that Mr. Blanchard's blood gases were normal. He explained that abnormal blood gases are one of the main factors in the diagnosis of a pulmonary embolus. Dr. Byrd agreed that Mr. Blanchard's symptoms indicated hyperasmolar dehydration and that Mr. Blanchard was properly treated, based on this diagnosis.
Since the jury found that Dr. Lee did not fail to use reasonable care in his treatment of Mr. Blanchard, we determine that the jury implicitly found that Dr. Lee's failure to diagnose and treat the pulmonary embolus was reasonable. The expert testimony summarized above supports this finding.
For the above reasons, we find that the jury was not manifestly erroneous in its finding that Dr. Lee was not negligent. Accordingly, we affirm the trial court's judgment in favor of Dr. Lee. However, since the directed verdict in favor of Dr. Farmer and Dr. Cowick was improperly granted, the judgment of the trial court in favor of Dr. Farmer, Dr. Cowick and Farmer, Cowick and Lee Limited is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.
One-half of the costs of this appeal are to be paid by plaintiffs; the other one-half of the costs are to be paid by Dr. Farmer and Dr. Cowick.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
SAVOIE, J., agrees in part and concurs in writing in part.
SAVOIE, Judge, concurring.
The majority opinion addressed two issues:
Issue No. 1: the trial court's granting of a directed verdict in favor of Dr. Cowick and Farmer individually.
Issue No. 2: the trial court's finding that Dr. Lee and the medical corporation of Farmer Cowick and Lee, Limited did not mal-practice.
I agree with the majority opinion as to Issue No. 2. I concur in the result as to Issue No. 1. My concurrence is based on the holding in Collett v. Branch, 516 So.2d 450, 452 (La.App. 1st Cir.1987) that "A motion for a directed verdict may be made either at the close of the plaintiff's case or at the close of all evidence, but may not be made at points in between."
I find no merit in the majority's other findings on this issue being of the opinion that the trial court, in granting the directed verdict, did not abuse the much discretion afforded it by La. Code of Civil Procedure article 1810.
NOTES
[1] Suit was also filed against Our Lady of the Lake Medical Center, Doctor's Memorial Hospital and Dr. Barry C. Scott. Subsequently, the suit against these three defendants was voluntarily dismissed upon plaintiffs' motion.