687 So.2d 685 (1997)
Kenneth Wayne GOULD, Plaintiff-Appellant,
v.
Wanda Faye GOULD, Defendant-Appellee.
No. 28996-CA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 1997.
*687 W. Eugene Golden & Associates by W. Eugene Golden, Shreveport, for Plaintiff-Appellant.
Graves, Graves & Hanna by James W. Graves, Shreveport, for Defendant-Appellee.
Before NORRIS, HIGHTOWER and BROWN, JJ.
NORRIS, Judge.
In this domestic matter, the father, Kenneth (hereinafter "Ken") Gould, appeals the trial court's dismissal of his petition to change the custody of his two children, Kenneth and Amanda. The mother, Wanda Gould, appeals the trial court's calculation of the child support obligation and the assessment of costs. For the reasons expressed, we affirm.

Procedural background and action of the district court
Ken and Wanda were divorced in Alabama in 1988. By considered decree, Wanda was awarded sole custody, subject to visitation, of the two children, Kenneth (born in July 1984) and Amanda (born in April 1987). Child support was set at $840 a month. In 1990 Wanda moved to Louisiana, taking the children with her; Ken regularly exercised visitation. Ken later lost his job as a chemical engineer and moved in with his parents in Paducah, Kentucky. In May 1994 he filed a rule to recognize the Alabama decree and reduce support; Wanda responded with her own rule for contempt and to make past due support executory. The court ultimately fixed support at $345 a month.
In July 1994 Ken filed the instant petition to change custody. Alleging that Wanda and her new husband, Jerry West, had physically abused the children and were not providing a stable home environment, he prayed for sole custody and the appointment of a mental health professional to evaluate all the parties. The district court named Dr. Mickey Jones, a Ph.D. counselor, who examined the children and parents and conducted home studies of the respective parties. Pending trial, she continued to counsel Kenneth.
In November 1994 Wanda filed another rule to increase child support; Ken responded with a rule for contempt. These were continued several times and apparently referred to the merits of the custody trial.
The matter came to trial in November and December 1995. Ken's case included extensive testimony from Dr. Jones, who felt that Kenneth was suffering from Attention Deficit Disorder ("ADD") and other psychological problems, and testified that the children's current home life with Wanda was detrimental.[1] Several other witnesses also testified; to accommodate one of Wanda's experts, Ken allowed Dr. H.N. Winterton, a pediatrician, to testify before the plaintiff had rested. Evidence was adduced over 11 days. At the conclusion of the plaintiff's case, Wanda moved for involuntary dismissal. Before ruling on the motion, the district court interviewed the children in camera, without the attorneys present.
When court reconvened, it heard arguments and orally granted Wanda's motion, dismissing Ken's petition to change custody. On Wanda's rule, he fixed support at $745.29 a month plus an arrearage of $1,767.06. He allocated each parent one tax deduction and assessed costs 50/50. The ruling was reduced to judgment of January 12, 1996.

Procedural issues
Before considering the substance of the custody issue, we will address Ken's first three assignments of error, which raise purely procedural questions. The first two challenge the involuntary dismissal. First he claims that Wanda never made a proper motion for involuntary dismissal, thus the court was unauthorized to grant it; second, the fact that Wanda called a defense witness *688 during the plaintiff's case-in-chief precluded the grant of the motion.
Involuntary dismissal is regulated by La. C.C.P. art. 1672, which provides:
Art. 1672. Involuntary dismissal

* * * * * *
B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
Immediately after Ken's attorney rested his case-in-chief, Wanda's attorney moved for involuntary dismissal, but he reminded the court that it had intended to question the children. R.p. 1365. The court interviewed the children in camera that afternoon, December 6. Prior to argument on the next trial date, December 11, Ken's attorney submitted a "Memorandum opposing involuntary dismissal." R.p. 245. Both parties then argued the motion; the court ruled orally. On these facts, it is obvious that the motion was properly made and submitted, a point that Ken conceded in his memorandum to the district court.[2] There is no merit to Ken's contention that Wanda failed to make the motion.
The second assignment charges that when one of Wanda's witnesses, Dr. Winterton, testified out of order, in the middle of the plaintiff's case, this precluded a subsequent grant of involuntary dismissal at the close of the plaintiff's case. He argues that when the defendant moves for involuntary dismissal, the court "must evaluate the plaintiff's evidence, undiluted by the defendant's evidence." Br., 6. In support, he cites Collett v. Branch, 516 So.2d 450 (La.App. 1st Cir.), writ denied 520 So.2d 752 (1988), and Blanchard v. Our Lady of the Lake Med. Center, 529 So.2d 1309 (La.App. 1st Cir.), writ denied 532 So.2d 772 (1988), jury cases in which the First Circuit held that the introduction of any defense evidence during the plaintiff's case-in-chief precluded the grant of the defendant's motion for directed verdict. He also cites the more recent case of Melady v. Wendy's of New Orleans, 95-913 (La.App. 5th Cir. 4/16/96), 673 So.2d 1094, writ denied 96-1249 (La.6/21/96), 675 So.2d 1088, in which the Fifth Circuit applied the same rationale to the motion for involuntary dismissal in a bench trial. All three cases, however, state that the motion can also be made at the close of all the evidence. Melady, at p. 3, 673 So.2d at 1097, and citations therein.
When the district court considered this motion, Wanda had cross examined all of Ken's witnesses (spending several days each on Dr. Jones and Ken himself), had herself testified extensively on cross and direct, and introduced 58 exhibits. There is no showing that additional evidence from Wanda would have altered the district court's ruling, a point virtually conceded by Ken's counsel.[3] The appellant has never requested a remand, as was granted in Melady, supra, but rather a judgment on the record submitted. Under these circumstances, the district court was entitled to pronounce judgment at the completion of trial under La. C.C.P. art. 1637. We perceive no error.
By his third assignment Ken urges the district court erred in conducting an in camera interview of the children without the attorneys present. While the Civil Code permits the court in a custody matter to ascertain the child's "reasonable preference" and his capacity to state a preference, La. C.C. art. 134(9), there is no statutory protocol for the judicial examination of the child. In Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5th Cir.), writ denied 464 So.2d 301 (1985), the court held that such examinations must be made with the attorneys present to *689 determine the child's competency to testify, and that a transcript must be made of the interview. This court and others have adopted the procedure. See Osborne v. McCoy, 485 So.2d 150 (La.App. 2d Cir.), writ denied 488 So.2d 1027 (1986); Diggs v. Tyler, 525 So.2d 1263 (La.App. 1st Cir.1988); Dykes v. Dykes, 488 So.2d 368 (La.App. 3d Cir.), writ denied 489 So.2d 1278 (1986).
In Osborne, supra, we held that the district court's failure to follow the Watermeier protocol was reversible only if the court's conduct was shown to be prejudicial. In the instant case the court excluded the attorneys from the interview because one of them, Mr. Graves, was Wanda's employer and knew the children well. R.p. 1368. Each side drew up questions which the court used "as an outline." R.p. 1369. The interviews were fully transcribed. In brief, Ken does not challenge the children's competency or state how the court's procedure prejudiced him; at trial he ultimately withdrew his objection. On this record we perceive no prejudice; the assignment lacks merit. Osborne v. McCoy, supra.

Change of circumstancesApplicable law
By his fourth assignment Ken urges the district court erred in disregarding the testimony of its own court-appointed expert, Dr. Jones, whose testimony proved that the children's current situation with Wanda was detrimental to their well-being and that any trauma associated with transferring custody to Ken would be outweighed by the benefits of the move. The substance of the argument is that Dr. Jones's testimony satisfied the plaintiff's burden of proving changed circumstances sufficient to warrant a change of custody under Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).
In Bergeron, supra, the Supreme Court addressed the question of whether the moving party, in a suit to obtain a change in a prior custody decree, must show that a change in circumstances has occurred which materially affects the child's well being. The court summarized its conclusions as follows:
When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
492 So.2d at 1200.
The court emphasized that not only the change of circumstances rule and the heavy burden rule, but also the appellate review standard apply to any petition to modify custody, whether it is joint or sole custody. Id., at 1203.
In 1993, the legislature amended and reenacted La. C.C. art 131 to provide that in a proceeding for divorce "or thereafter, the court shall award custody of a child in accordance with the best interest of the child." La. Acts 1993, No. 261. Comments to this amendment indicate that the standards set out in Bergeron, supra, remain valid.[4]
The appellate standard of review holds that the appellate court may not set aside a trial court's or a jury's findings of fact unless those findings are clearly wrong or manifestly erroneous. Stobart v. State, 617 So.2d 880 (La.1993). The test is essentially whether the trial court's findings are reasonable. Mart v. Hill, 505 So.2d 1120 (La.1987). Even if the appellate court feels that its own evaluations are more reasonable than the fact finder's, the latter's reasonable determinations, *690 inferences of fact and credibility judgments should not be disturbed. Lewis v. State, 94-2370 (La.4/21/95), 654 So.2d 311. When there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.; Stobart v. State, supra.
The fact finder's great discretion extends to its assessment of expert testimony. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). The weight to be given expert testimony depends, ultimately, on the facts on which it is based, as well as the professional qualifications and experience of the expert. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229; Thomas v. Petrolane Gas Service, 588 So.2d 711 (La.App. 2d Cir.1991). For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record; if it is not, the trial court may reject it. Meany v. Meany, supra; Rogers v. Roch, 95-242 (La.App. 5th Cir. 10/18/95), 663 So.2d 811.

Change of circumstances Synopsis of evidence
The thrust of Ken's argument is that Dr. Jones's testimony satisfied both prongs of the Bergeron test. Appointed by the court, Dr. Jones spent 14 months evaluating and counseling with the parties and the children. She stated, as a general conclusion, that their home life with Wanda was detrimental to their mental, emotional, and possibly physical well being. R.p. 476. She based her opinion upon, inter alia, the children's statements that in October 1994 (they were ages 10 and seven), Wanda was leaving them at home alone after school, while she was at work; during this unsupervised time, Kenneth was sometimes crossing Youree Drive, a busy thoroughfare, to see a friend, sometimes leaving Amanda at the apartment, but sometimes taking her along. Dr. Jones also believed that Wanda, in a fit of anger, had hurled an ice tray at Kenneth, cutting him in the face.
Dr. Jones also felt Kenneth had serious educational problems that Wanda was failing to address. One of his teachers reported that he possibly had ADD; Dr. Jones ran several psychological tests, one of which in her view confirmed this diagnosis. Several of Kenneth's teachers testified, verifying that his school performance was not equal to the high potential he demonstrated in standardized tests; that he often failed to turn in assignments or to complete work begun at school; and that when they would advise Wanda about these problems, she was supportive but did nothing to address the problems.
Dr. Jones testified that Wanda created instability for the children in that she married a man from DeSoto Parish, Jerry West, on November 13, 1993, but separated from him on at least three occasions within one year. She also moved very often, with the result that Kenneth had attended five different schools between first and fifth grades, and Amanda had attended three between first and third. This, she felt, contributed to school problems and poor social adjustment.
Dr. Jones also noted what she considered to be serious health problems in Kenneth, encopresis and enuresis. Two medical doctors found no physiological explanation for these conditions; Dr. Irizarry, a family practitioner and friend of Ken's, testified that the causes were likely social, emotional and stress. Dr. Jones also identified, and other witnesses corroborated, a number of lesser health problems: head lice in both children, bronchitis in Kenneth, and an infected pierced ear in Amanda.
Dr. Jones's home study of Ken's parents' house in Paducah was very favorable; she spent three days with them, noting their orderly household, strong ties to Seventh Day Adventist Church, vegetarian diet, and good schools nearby. While with their father during summer visitation, the children were "perfect angels." R.p. 329. She concluded that moving the children would cause some trauma to them, but the benefits of living in Ken's home environment would outweigh the disadvantages of the move. R.pp. 387-388.
There was, however, other evidence besides Dr. Jones's testimony. Wanda testified in extenso regarding the incidents that the children reported to Dr. Jones, and we will not belabor the minutiae of years of household *691 occurrences. She attributed her occasional inability to provide "store-bought" day care, and her frequent moves, to the fact that Ken was periodically unemployed (for six months in 1989 and then from November 1993 through January 1995), virtually ending her child support. She described their situation during these times as "impoverished" and admitted that she had to file for Chapter 13 bankruptcy. She also admitted that her marriage to Jerry West had failed, but denied that he had ever mistreated the children.
On cross examination, Wanda initially denied that Kenneth had any "serious behavior problems." However, she eventually admitted that school officials had been concerned over his failure to do or complete school assignments and homework. She also initially denied that Kenneth had any problem with encopresis, but then conceded that at Dr. Jones's urging she had discussed with him the need for better hygiene. She insisted that when Kenneth was at home with her, the problem was never as pronounced as when Ken and Dr. Jones observed it in Kentucky. She also admitted that Amanda's ear "got a little red," and stated that Ken had been strongly opposed to letting her get her ears pierced.
Ken's reaction to the ear infection is worthy of note. To prove that there was a problem, he made a videotape showing a neighbor removing the starter stud from Amanda's swollen ear, squeezing out some infected matter, and swabbing the ear for about 10 minutes.[5] He then took her to Bossier Medical Center, where a Dr. Hughes prescribed an antibiotic. Two days later, Ken took her to Minden to see Dr. Irizarry, who "didn't really see any infection at that time." The incident illustrates the great lengths to which Ken went, throughout this case, to document everything that he perceived as reflecting badly on Wanda. He secretly tape recorded most of their phone conversations and some of their face-to-face ones. He went to Kenneth's schools and tape recorded conferences with teachers, without their knowledge or consent (leading Wanda to testify that the boy was humiliated that his father was "trying to put a diaper on him"). Ken even recorded at least one conversation with Wanda's attorney, Mr. Graves.[6] There was also testimony that during a visitation, Kenneth had an "accident" while at a restaurant with Ken; Ken took him in the parking lot to photograph his pants, and did not permit him to change clothes.
Dr. Jones did not mention that Ken's conduct could be having any adverse effect on Kenneth. However, Dr. Barnes in Paducah found that the child had an unusually high stress level, and Dr. Irizarry testified that stress was the likely cause of the encopresis and enuresis. Dr. Donita Gothard, another psychologist who examined Ken with the children, noted that Ken had apparently coached them prior to the exam, and "such instruction places a burden on children by making them privy to and responsible for adult matters."
Dr. Jones's opinion that Kenny suffered from ADD was not confirmed by other experts. Dr. Perry Hill, a clinical psychologist, examined him and found his history was "not consistent with a diagnosis of ADD," conceding only that he showed some symptoms consistent with that condition. Dr. Winterton, the children's pediatrician, testified that he was not qualified to diagnose ADD, but he could recognize it and did not think an assessment was necessary for Kenneth. He added that certain local teachers, including the one of Kenneth's, were not competent to diagnose ADD yet they referred students for assessments regularly. He was fairly certain that Dr. Jones was not competent to make the diagnosis.
Dr. Jones's expertise was questioned not only by Dr. Winterton but also by Wanda's lawyer, Mr. Graves, who attempted to withdraw his stipulation that she was an expert in counseling psychology. He showed that Dr. Jones obtained her Ph.D. by extension classes, held in Shreveport at night, offered *692 by Cornerstone University in Lake Charles, an institution which he claimed was not accredited. Dr. Jones did not contradict this, but insisted that she was a properly licensed counselor. The court refused to let Mr. Graves to revoke his stipulation, but commented that the revelations would affect the weight of her testimony. R.p. 624.

Change of circumstancesDiscussion
From the preceding synopsis we see that the trial court heard testimony from Dr. Jones that tended to support both prongs of the Bergeron test. We cannot dispute the trial court's dictum that if it were a case of initial custody, the court would award it to the father on the record presented. R.p. 1433. However, Bergeron requires Ken to meet the "heavy burden" of proving that continuing the present custody plan is so deleterious to the children as to justify modifying it, or to prove by clear and convincing evidence that the harm arising from a change of environment will be substantially outweighed by the benefits. 492 So.2d at 1200. Several factors warrant the trial court's finding that Ken did not meet the burden.
First, Wanda provided plausible explanations for some, though not all, of the health and safety concerns that led Dr. Jones to declare the current custody plan "deleterious." Notably, she testified that protracted periods without child support, or with reduced amounts, prevented her from having "store-bought" child care. This testimony, if believed by the trial court, would erode some of the foundations of Dr. Jones's opinion. Meany v. Meany, supra. Second, other experts, notably Drs. Winterton and Hill, cogently disputed Dr. Jones's diagnosis of ADD.[7] The trial court has discretion to accept one expert opinion over another. Sistler v. Liberty Mutual, supra. There was also serious dispute as to Dr. Jones's credentials; this could diminish the court's reliance on her opinion. Meany v. Meany, supra. These are grounds that could justify the trial court's refusal to accept the opinion of the court-appointed expert. Moreover, some of Ken's conduct, e.g., extensively taping conversations, photographing and saving soiled underwear, taking the children to the hospital to document minor injuries, perhaps coaching them prior to an examination by Dr. Gothard, etc., can be viewed as placing exceptional stress on the children and just as responsible, if not more so, for the reported problems than Wanda's conduct. On this long and intricate record, we cannot find plain error in the trial court's finding that Ken did not meet the heavy burden of proving that the current custody plan is deleterious, or of proving by clear and convincing evidence that the proposed change would yield benefits that outweigh the resulting trauma. Stobart v. State, supra.

Child support calculation
By her own appeal Wanda urges the trial court erred in its support calculations. Specifically, she contends the court failed to find that Ken was voluntarily underemployed, under R.S. 9:315.9, and failed to consider his full income potential; failed to include as income the free room and board he receives from his parents in Paducah, Kentucky; and improperly deviated from the support guidelines by deducting the extraordinary expenses of his travel and lodging from Paducah to Shreveport to exercise visitation.
The child support guidelines of R.S. 9:315 et seq. establish a rebuttable presumption of the amount of child support that is proper. R.S. 9:315.1 A. The court may deviate from the guidelines if their application would not be in the best interest of the child or would be inequitable to the parties. R.S. 9:315.1 B. The trial court is vested with much discretion in fixing support, and its reasonable determinations will not be disturbed unless there is a clear abuse of discretion. Settle v. Settle, 25,643 (La.App.2d Cir. 3/30/94), 635 So.2d 456, writ denied 94-1340 (La.9/16/94), 642 So.2d 194. Reasons for deviation must be stated in the record, and they may include, inter alia, "any other consideration which would make application of the guidelines not in the best interest of the child or children or inequitable to the parties." R.S. 9:315.1 C(7).
*693 If a party is voluntarily unemployed or underemployed, child support must be based on a determination of his or her income earning potential, unless the party is physically or mentally incapacitated or is caring for a child of the parties under the age of five years. R.S. 9:315.9. Voluntary underemployment is a question of good faith on the obligor spouse. Hutto v. Kneipp, 627 So.2d 802 (La.App. 2d Cir.1993). However, the trial court has wide discretion in determining the credibility of the witness; whether the obligor spouse is in good faith in ending or reducing his income is a factual determination which will not be disturbed absent an abuse of discretion. McHale v. McHale, 612 So.2d 969 (La.App. 2d Cir.1993), and citations therein. The court also has discretion to add to the basic support calculation "any expenses for transportation of the child from one party to another." R.S. 9:315.6.
The district court gave detailed oral reasons for judgment, showing that it considered the issues of voluntary underemployment and extraordinary travel expenses to be directly related to the exercise of visitation. In order to make the bi-weekly 10-hour drive from Paducah to Shreveport, Ken takes off work every other Friday. He is paid for only an average of 36 hours per week. Feeling that Ken had been extremely regular and diligent in visiting his children, the court held it would be "inequitable" to punish him for the time he must miss. We perceive no error; on the facts presented, the time spent traveling to see his kids should not be charged as his own fault or neglect. R.S. 9:315(6)(b).
Ken also testified that gasoline cost him about $50 per round trip, and the motel room averaged $34 a night. Based on two round trips per month, and two nights of motel each trip, the court deviated from the guidelines by reducing Ken's support obligation by $236.00. The court was entitled to accept Ken's testimony that these were necessary expenses for visitation. McHale v. McHale, supra. If Wanda were required to transport the children to Paducah twice a month, the court would be entitled to add travel expenses to the basic support obligation. R.S. 9:315.6(2). Since Ken is shouldering the entire expense of visitation, the court should have the discretion to deduct this reasonable expense from the obligation. We perceive no error.
As for the living expenses, Ken claimed in an affidavit that he paid his parents $300 a month for rent.[8] He testified that he had not paid this since November 1993, but that the debt has accrued. R.p. 1183. Wanda offered no evidence to contradict this; the court was therefore entitled to accept Ken's explanation that he was not receiving any special benefit from expense-sharing, R.S. 9:315(6)(c), and not to include this as an element of his actual gross income.
This assignment lacks merit.

Court costs and conclusion
Wanda also urges the trial court erred in "casting her with one half of plaintiff's costs and all of her costs when an involuntary dismissal was granted." Br., 10. She argues that Ken "pointlessly caused costs to be incurred," including private investigators, excessive pleadings and subpoenas, additional sessions with Dr. Jones, over a dozen doctor visits to document abuse or neglect, and other specified charges, while she herself absorbed the expenses of her own expert, Dr. Gothard.
Contrary to Wanda's contention, the judgment clearly includes Dr. Gothard's fees as a cost to be divided equally. R.p. 252 (Judgment, ¶ II C). The judgment does not cast investigator's fees as costs. In these particulars the record utterly fails to substantiate Wanda's claims and the assignment is devoid of merit.
The court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. La. C.C.P. art.1920. The trial court thus has great discretion in determining and allocating court costs. Cajun Elec. Power Coop. v. Owens-Corning Fiberglass Corp., 616 So.2d 645 (La.1993); Matter of Succ. of James, 27,639 (La.App.2d Cir. 12/6/95), 665 So.2d 715. The court stated *694 that all of Dr. Jones's fees would be included because the children needed the additional counseling and because the home studies were of some use to the court. R.p. 1464. The court also commented that even though Ken's rule was dismissed, he had reasonable grounds to bring it. We perceive no abuse of discretion in these observations. The assessment of costs will be affirmed.
For the reasons expressed, the judgment of the trial court is affirmed. Costs are assessed equally to the parties.
AFFIRMED.
NOTES
[1] We will summarize the relevant portions of the trial testimony in connection with the plaintiff's fourth assignment of error.
[2] "At the close of KENNETH WAYNE GOULD'S case-in-chief, counsel for WANDA FAYE GOULD moved for involuntary dismissal under the provisions of La. C.C.P. Article 1672 B." R.p. 245.
[3] At oral argument Mr. Golden stated that the record was complete and the "real" issue was whether he met his burden of proof.
[4] "This Article should be followed in actions to change custody as well as in those to initially set it. An additional, jurisprudential requirement is imposed in actions to change custody decisions rendered in considered decrees, however. In such actions the proponent of change must show that a change of circumstances has occurred such that `the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or ... that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.' Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986). Accord: Smith v. Smith, 559 So.2d 48 (La.App. 4th Cir.1990). This burden of proof is imposed by the jurisprudence as a means of implementing the best interest standard in light of the special considerations present in change of custody cases." La. C.C. art. 131, Comments1993, (d).
[5] The video was introduced as Exhibit P-38. It shows that one of the ears was mildly infected.
[6] All told, Ken made 69 audio tapes of various conversations. Transcripts of some were offered in evidence at trial.
[7] An internist, Dr. Karen Crissinger, also disputed the diagnosis of encopresis. Exhibit P-12.
[8] Exhibit D-58, from April 1994.