627 So.2d 802 (1993)
Lisa Kneipp HUTTO, Plaintiff-Appellee,
v.
Lee Benson KNEIPP, Defendant-Appellant.
No. 25321-CA.
Court of Appeal of Louisiana, Second Circuit.
December 3, 1993.
Rehearing Denied January 13, 1994.
*803 Robert J. Donovan, Jr., Shreveport, for plaintiff-appellee.
Sutton & Sutton by Bobby D. Sutton, Jr., Shreveport, Kneipp & Hastings by Donald L. Kneipp, and E. Eugene Hastings, Monroe, for defendant-appellant.
Before NORRIS, LINDSAY and BROWN, JJ.
NORRIS, Judge.
In early 1992, Reverend Kneipp and Mrs. Hutto each filed a rule to modify their established custody/child support agreement. In its ruling on August 20, 1992, the trial court amended the joint custody plan, declaring Mrs. Hutto domiciliary parent of their two children and awarding her $926.20 per month in child support, reduced by half during June, July, and August. The court allowed Mrs. Hutto to provide the children's medical insurance and ordered Reverend Kneipp to pay half of their uninsured medical and dental expenses. On October 14, 1992, Reverend Kneipp filed a rule to modify his child support obligation alleging a change in circumstances had occurred since the prior award was set. He further sought to terminate his obligation to pay half of his children's medical insurance and uninsured medical expenses and instead, to maintain their health insurance through his new employer. The trial court ruled against Reverend Kneipp on December 15, 1992, rejecting both demands. He appeals both rulings. For the reasons expressed, we affirm the August 1992 ruling and amend and affirm the December 1992 ruling.

Factual and Procedural Background
Lee Kneipp married Lisa Sigrest on August 26, 1975. They had two children, Joshua in 1978, and Courtney in 1984. Lisa Kneipp (remarried as Lisa Hutto) obtained a judicial separation in 1986 and divorce in early 1987. The parties agreed upon joint custody, with Lisa as domiciliary parent, and Reverend Kneipp paying child support of $500.00 per month. Reverend Kneipp maintained the children's medical insurance, but each party would pay 50 percent of their uninsured medical and dental expenses.
On June 11, 1990, the parties agreed to modify this custody/support arrangement. Reverend Kneipp, also now remarried, became the domiciliary parent of Joshua and, by agreement of the parties, his support obligation was reduced to $200.00 per month. Each party paid the medical expenses of the child in his or her custody and shared dental expenses.
By early 1992, dissatisfied with the custody/support arrangement, each filed a rule seeking custody of both children and child support. Hearing on the rules was held on August 18 and 20, 1992. Reverend Kneipp dismissed his rule for custody of Courtney at the beginning of trial. As for Joshua, during trial, he further agreed Mrs. Hutto could have custody. Only the child support issue remained.
The trial court ruled from the bench on August 20, 1992 declaring Mrs. Hutto domiciliary parent of both children and awarding her child support in the amount of $926.20 per month, reduced by half during the summer months. The trial court used Reverend Kneipp's $3,964 monthly combined income to calculate child support. Reverend Kneipp received $3,264 per month from his job as *804 Program Director for Youth Services at Sabine Valley Mental Health Center and $700 per month from his flexible part-time job at Holy Cross Episcopal Church. Reverend Kneipp, an Episcopalian priest, who already had his M.S. in psychology, had returned to school to obtain a doctorate in psychology. He accepted employment in that field at Sabine to complete the internship requirement of this doctoral program. The court further allowed Mrs. Hutto to maintain the children on her medical insurance, with Mr. Kniepp paying his percentage of the premium and both paying half of any uncovered medical and dental expenses incurred. The ruling was reduced to formal judgment and signed on November 23, 1992.
Shortly after the August 20 ruling, Reverend Kneipp submitted letters of resignation, dated October 1, 1992, to Sabine and Holy Cross, effective mid-November. He accepted full-time employment as rector for St. Michael's Episcopalian Church in Pineville, effective November 16, 1992, earning $22,000 a year or $1,833 per month, 54 percent less than he had been making. Consequently, he filed a rule on October 14, 1992, to modify his child support obligation to reflect this change in circumstances and further sought to provide his children's medical insurance. In its December 1992 ruling, the trial court rejected the relief sought by Reverend Kneipp, finding that he switched to a lower-paying job in bad faith and was voluntarily underemployed. The court also maintained its prior order allowing Mrs. Hutto to keep the children on her medical insurance, and requiring Reverend Kneipp to pay 50 percent of any uncovered medical expenses and $926.20 per month in child support. This ruling was reduced to formal judgment and signed on January 4, 1993.
Reverend Kneipp appeals both judgments. He contests the finding that he was voluntarily underemployed. In the alternative, if his potential income is to be considered, he urges that only his income from the full-time job be used, rather than the combined income from both jobs. He also contends the trial court erred in ordering him to pay 50 percent of the children's uncovered medical expenses in addition to the basic support obligation. Finally, he asserts the trial court erred in failing to include Mrs. Hutto's current husband's income in the child support calculations.

Voluntary underemployment
The Child Support Guidelines apply to this proceeding to modify child support filed on October 14, 1992. Furthermore, there is a rebuttable presumption that the amount of child support obtained from these guidelines is the proper amount. La.R.S. 9:315.1A.
The party seeking the reduction in child support payments must show a change in circumstances of one of the parties between the time of the previous award and the motion to modify it. La.R.S. 9:311. However, not every change in circumstances warrants a reduction. Louisiana jurisprudence dealing with reduction of support distinguishes between a voluntary and involuntary change in circumstances. Goodall v. Goodall, 561 So.2d 867 (La.App. 2d Cir.1990); Guinn v. Guinn, 405 So.2d 620 (La.App. 3d Cir.1981); Laiche v. Laiche, 237 La. 298, 111 So.2d 120 (1959). In Laiche, the Louisiana Supreme Court described an involuntary condition as one brought about by a fortuitous event or other circumstances beyond that person's control, such as loss of one's position or illness. The court held that a voluntary act rendering it difficult or impossible to meet one's support obligation cannot be countenanced as a ground for release, either wholly or partially, from the obligation. Id. 111 So.2d at 122.
Today, a parent whose change in circumstances is due to a voluntary termination of employment may still obtain a reduction in child support payments if he or she can show that: (1) a change in circumstances occurred; (2) the voluntary change is reasonable and justified; (3) he or she is in good faith and not attempting to avoid the alimentary obligation; and (4) the action will not deprive the child of continued reasonable financial support. Mosley v. Mosley, 348 So.2d 225 (La. App. 3d Cir.), writ denied, 350 So.2d 1213 (1977).
*805 If a parent is voluntarily underemployed, child support shall be calculated based on his or her income earning potential. La.R.S. 9:315.9. "Income" is defined in La.R.S. 9:315(6) to include:
Potential income of a party, if the party is voluntarily unemployed or underemployed. A party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party.
Reverend Kneipp introduced evidence which showed that he now earns 54 percent less than he did when child support was set. However, there is no question that he voluntarily quit his two jobs, where he was earning a substantially greater salary, to move to a lower-paying position at a different church. The crucial issue then is Reverend Kneipp's motive for his voluntary resignation and whether his change to a lower-paying job was made in good faith.
In virtually every case where a parent's voluntary unemployment or underemployment was found to be in good faith, courts have recognized extenuating circumstances beyond that parent's control which influenced and necessitated the voluntary change in employment. We have reviewed at length the cases cited by each party.
Courts have generally allowed a reduction in child support where parents were returning to school with hopes of increasing their salary (Mosley v. Mosley, supra; Massingill v. Massingill, 564 So.2d 770 (La.App. 2d Cir.1990); Daigre v. Daigre, 527 So.2d 9 (La.App. 3d Cir.1988)); or leaving employment due to the business's financial difficulty or strained working relationships to find other employment or start a new business. (Goodall v. Goodall, supra; Hendrick v. Hendrick, 470 So.2d 449 (La.App. 3d Cir. 1985)). In almost every case, the court noted that the unemployment or underemployment was a short term sacrifice which could lead to long term benefit.
On the other hand, courts have refused reductions in child support where a parent's own actions, without any extenuating circumstances, caused the inability to pay. McKenna v. Steen, 422 So.2d 615 (La.App. 3d Cir. 1982), involved a factual pattern similar to the cases cited above where a parent decided to return to school. Mr. McKenna, after agreeing to pay $1600 per month child support, voluntarily sold his lucrative dentistry practice to enroll in law school. The court concluded that Mr. McKenna sold his practice to reduce his child support payments. It noted he was not attempting to increase his economic stature by attending law school because he had a profitable practice, which grossed a substantial sum. There were no compelling reasons justifying Mr. McKenna's decision to change careers; he simply chose to do so. The court in denying any reduction in child support stated, "[Mr. McKenna] cannot under these circumstances escape his obligation of support merely because he chooses to no longer practice dentistry."
The record in Reverend Kneipp's case supports the trial court's finding that his decision to return full-time to the ministry at a lower wage was not influenced by fortuitous events, extenuating circumstances, or factors beyond his control. The trial court specifically rejected Reverend Kneipp's contention that he returned full-time to the ministry because he was "called" to do so. The trial court concluded that Reverend Kneipp, like Mr. McKenna, simply chose to do so in an effort to reduce his child support payments. We refer to a portion of the trial court's written reasons on this point:
There is no question in the mind of the undersigned that Mr. Kneipp's decision to return to the ministry was not made in good faith, but rather was by design so as to substantially reduce his child support obligation[.] * * * Although it is admirable for a person to dedicate [his] life to the ministry or to some other form of public service, generally at wages that are below what [he] could earn in the private sector of the economy, the fact remains that to permit a payor to opt for employment that he or she may deem intellectually gratifying without due regard for the economic consequences that it will cause his or her children, is simply wrong. The above set forth jurisprudence supports the proposition that a payor cannot, after the rendition *806 of a child support award, run out and change professions solely on intellectual grounds, and then seek to have the child support obligation reduced.
Entering an honorable profession for self-fulfillment does not justify a father's avoidance of his inherent obligation to support his minor children. Moreover, upon the record before us, we cannot say that the trial court was clearly wrong in concluding that Reverend Kneipp's motive in accepting lower-paying work was to reduce his child support payments.
As the trial court pointed out, Reverend Kneipp testified he had numerous conversations, during his residency, with persons in the ministry about returning once he received his advanced degree; however, he neither provided documentation of these conversations nor called any persons with whom he had spoken to testify. In short, he provided nothing to corroborate these alleged self-serving conversations. Reverend Kneipp also testified that he always intended to remain in the ministry, even while attending graduate school in psychology. When asked why he did not tell the court at the first hearing in August that his employment in the psychology field was only temporary because he intended to return to the ministry, he answered, "I was not asked that question." R. p. 572. The trial court was not clearly wrong in concluding that if Reverend Kneipp truly intended at all times to remain in the ministry as he so strenuously argues now, he would likely have mentioned this fact at the original hearing in August setting child support.[1]
On the contrary, Mrs. Hutto testified that while Reverend Kneipp was pursuing his M.S. in psychology, he told her that he intended to leave the ministry and become a psychologist. R. p. 550. Reverend Kneipp denied saying this; however, the trial court obviously believed Mrs. Hutto. Furthermore, he testified during the August child support hearing that he had completed his residency requirement as of July 1992. R. p. 241. However, he did not quit Sabine when his residency ended and was still employed there in August when support was set. In addition, Reverend Kneipp admitted that during the two years he lived in Commerce, Texas and worked on his doctorate in psychology, he attended church only about once a month. R. p. 254. Given these facts, the trial court could have concluded that he intended to remain in the psychology field.
Moreover, the trial court had the opportunity to observe Reverend Kneipp's demeanor and assess his credibility during the numerous and lengthy hearings on custody and child support. Based on these observations, the trial court found Reverend Kneipp was in bad faith. A trial court's factual findings and credibility determinations are entitled to great weight and will not be disturbed on appeal absent manifest error. Stobart v. State of Louisiana, Through DOTD, 617 So.2d 880 (La.1993). Considering the evidence in its entirety, we find no manifest error.
Finally, there is the timing of Reverend Kneipp's change of jobs. He sent letters of resignation to Sabine and Holy Cross dated October 1, 1992, only a few weeks after the court awarded Mrs. Hutto child support. He filed his motion to reduce his child support immediately thereafter, on October 14, 1992. There was no evidence other than his own testimony that returning to a full-time, low-paying ministry antedated the court's August 20 decision. The trial court considered the timing of this move suspicious, to say the least.
On this record and the court's credibility determination, the trial court was not clearly wrong in finding that Reverend Kneipp was in bad faith and voluntarily underemployed. Thus, the trial court was correct to consider Reverend Kneipp's potential rather than actual income in calculating the child support award. This conclusion is affirmed consistent with our findings below regarding his potential income.

*807 Reverend Kneipp's potential income

Because Reverend Kneipp was voluntarily underemployed, we must consider his income earning potential in calculating his child support obligation. La.R.S. 9:315.9. Reverend Kneipp argues that the trial court should have calculated his potential gross income based only on his full-time salary. The record shows that Reverend Kneipp earned $3,964 per month when support was set. This income includes the $3,264 a month he received from his job at Sabine and $700 a month from extra part-time work at Holy Cross. The trial court set Reverend Kneipp's child support payments based on both incomes. Insofar as this assignment addresses the August 20 ruling, we are constrained to find this issue was not presented to the trial court. However, insofar as it addresses the December 15 ruling, the argument has merit. Including both incomes, on the record presented, was both inequitable and an abuse of discretion.
Income earning potential is the amount of income a person is capable of earning based on his or her career choice and educational and skill level. When the parties separated in 1986, Reverend Kneipp was a parish priest. When support was set in August 1992, he was a licensed psychologist. His earning potential undoubtedly increased beyond that of a parish priest when he obtained his Ph.D. in psychology. While interning, he held a job that is the only record evidence of his enhanced earning ability. It is uncontested that he earned considerably more at Sabine than he now does as a rector at St. Michael's. Therefore, the trial court was not plainly wrong to calculate child support based on Reverend Kneipp's position at Sabine, commensurate with his career field and educational level.
The same is not true for Reverend Kneipp's part-time employment. The record shows that he was not in the habit of holding a second job when he had a permanent full-time position in the past. Reverend Kneipp's situation while completing his doctorate was unique; the graduate internship at Sabine obviously afforded him the flexibility for outside work that other professional positions will not. Reverend Kneipp testified that at Sabine, he was able to work Mondays, Tuesdays, and Thursdays from 8 a.m. to 5 p.m. and Fridays from 8 a.m. to noon or 3 p.m. Holy Cross also accommodated Reverend Kneipp by offering him a flexible schedule, which allowed him to work only Wednesdays and Sunday mornings. His present employment contract with St. Michael's does not offer the same flexibility. It provides that he may work up to six days a week, including Sunday services or 48 hours per week. This work includes not only activities directed toward the parish, but also services on behalf of the Diocese and the broader community. These services, in many cases, are performed outside of normal working hours. It strikes us as inequitable to hold Reverend Kneipp to a two-job standard of income under the facts and circumstances of this case. To do so could jeopardize his full-time employment and prove contrary to the children's best interest.
In addition, this minor change in the amount of support will not financially penalize Joshua and Courtney. Mrs. Hutto's available income, together with Reverend Kneipp's child support more than ensures a standard of living commensurate with what the children enjoyed before the divorce. Schelldorf v. Schelldorf, 568 So.2d 168 (La. App. 2d Cir.1990). To exclude his part-time income from the calculation will not deprive the children of continued, reasonable financial support and will show ample regard for his circumstances. La.C.C. art. 231.
We therefore amend the December 15, 1992 ruling requiring Reverend Kneipp to pay child support in the amount of $926.20 per month insofar as it is based on his income from two jobs. The new figures are set forth at the end of this opinion.

Uninsured medical expenses
Reverend Kneipp contends the trial court erred in ordering him to pay 50 percent of the children's medical expenses that are not covered by insurance. In support, he cites Germany v. Germany, 599 So.2d 350 (La.App. 1st Cir.1992), where the court held that "since there is no provision in the Child Support Guidelines for adding the ordinary medical and dental expenses to the child *808 support obligation, we must presume those expenses are included in the figures set forth in La.R.S. 315.14." The trial court disagreed with the appellate court's reasoning and conclusion in Germany. However, it determined that even if the guidelines calculation included uninsured medical expenses, a deviation from the guidelines was warranted here. The court reasoned that it would be inequitable to hold the payee spouse responsible for all future uncovered medical expenses, as this would discourage parents from obtaining medical treatment for their children in times of economic difficulty. Further, it would be in the children's best interest and consistent with La.C.C. art. 227 for both parents to participate in paying these expenses.
Admittedly, the statute is silent as to minor, uninsured medical expenses, and this silence could be viewed as legislative intent to assign them to the custodial parent. Cf. La.R.S. 9:315.4, 315.5. However, we find no error in the trial court's decision to deviate from the guidelines and have both parents contribute equally to these expenses. La. R.S. 9:315.1B specifically allows the court to deviate from the guidelines if their application would not be in the best interest of the child or would be inequitable to the parties. The court stated that sharing these expenses was necessary to assure that the children would receive regular and prompt medical attention. We have no basis on which to declare this plainly wrong.

Current spouse's income
Reverend Kneipp contends Mr. Hutto's income should have been included in the child support calculations on the basis of La.R.S. 9:315(6)(c), which provides:
The court may also consider as income the benefits a party derives from expense-sharing or other sources; however, in determining the benefits of expense-sharing, the court shall not consider the income of another spouse, regardless of the legal regime under which the remarriage exists, except to the extent that such income is used directly to reduce the cost of a party's actual expenses.
The word "may" is permissive and leaves within the trial court's discretion whether or not to consider benefits of expense-sharing. This decision will not be disturbed absent an abuse of discretion. Crockett v. Crockett, 575 So.2d 942 (La.App. 2d Cir.1991); Norred v. Norred, 591 So.2d 396 (La.App. 2d Cir.), writ denied, 592 So.2d 1319 (1992).
The trial court did not include Mr. Hutto's salary because Mr. Hutto earns $1,750 per month, considerably less than Mrs. Hutto's $2,333 per month income and the parties provided no evidence of their expenses. The record in this case suggests that Mr. and Mrs. Hutto share some expenses. Mr. and Mrs. Hutto testified that they maintain a joint checking account from which bills are paid and both deposit checks into it. However, the extent to which Mr. Hutto's income reduced Mrs. Hutto's actual expenses is not disclosed by the record. See Mayo v. Crazovich, 621 So.2d 120 (La.App. 2d Cir.1993). Therefore, we cannot say from this record that the trial court was clearly wrong in failing to include Mr. Hutto's income in the child support calculations.

Calculations
Reverend Kneipp's income earning potential is fixed at $3,264.00 per month and Mrs. Hutto's gross monthly income is $2,333.33. Their combined monthly gross income is $5,597.33. Reverend Kneipp's proportionate share of this amount is 58 percent. The basic child support obligation set forth in La.R.S. 9:315.14 is $1,167. The court added to this figure net child care costs in the amount of $154.17 and medical insurance premium of $40.00. Therefore, the total support obligation is $1,361.17. Reverend Kneipp's share of this is $789.48 ($1,361.17 × .58).

Conclusion
For these reasons, the trial court's ruling of August 1992 (reduced to formal judgment and signed on November 23, 1992) is affirmed. The ruling of December 1992 (reduced to formal judgment and signed on *809 January 4, 1993) is amended to reduce Reverend Kneipp's monthly child support obligation to $789.48 per month, reflecting only his monthly income earning potential from Sabine, and affirmed in all other respects. Costs of this appeal are assessed equally to Reverend Kneipp and Mrs. Hutto.
AMENDED AND AFFIRMED.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, LINDSAY, BROWN and WILLIAMS, JJ.
Rehearing denied.
NOTES
[1] We note that counsel for Reverend Kneipp contends the trial court informed him in chambers during the first trial that testimony of such future plans was inadmissible. The trial court essentially denied it made such a ruling and stated for the record its recollection. Defense counsel agreed with the trial court's recollected version. R. p. 570-71.