750 So.2d 512 (2000)
Wayne D. LUTKE, Jr., Plaintiff-respondent,
v.
Katrina Ann Moore LUTKE, Defendant-applicant.
No. 33,001-CW.
Court of Appeal of Louisiana, Second Circuit.
February 1, 2000.
*514 Bodenheimer, Jones & Szwak by James P. Bodenheimer, Shreveport, Counsel for Applicant.
Joe B. Cordill, Jr., Counsel for Respondent.
Before GASKINS, CARAWAY and KOSTELKA, JJ.
CARAWAY, J.
Because of the parent's delinquency in the payment of her child support obligations, the trial court held her in contempt of court and imposed an unconditional, and thus criminal, jail sentence. Additionally, the trial court refused to modify and lower the parent's support obligation finding that her depression and alcohol abuse did not excuse her unemployment. The trial court further suspended the parent's driver's license for her child support delinquency. After granting the parent's writ application to consider the criminal conviction and the other issues, we now affirm in part and reverse in part.

Facts
Wayne Lutke, Jr. ("Wayne") and Katrina Ann Moore Lutke ("Katrina") were divorced on May 4, 1994 after nearly fourteen years of marriage. The Lutkes had three minor children, and the court ordered a joint custody arrangement with Wayne being the custodial parent. On September 27, 1994, the parties, by way of consent judgment and in compliance with La. R.S. 9:315.14, agreed that Katrina would pay Wayne $446 per month in child support. This amount was based upon Katrina's earnings of $1,820 per month.
Wayne first hailed Katrina to court for past due child support payments in 1997. On November 10, 1997, the court found Katrina in contempt of court "for July 1996 non-payment" and also ruled that "by agreement plaintiff is awarded $5,997.94, $900 attorney fees and court cost." Although the accrued arrearages were substantial, the court found that Katrina did not wilfully disobey the child support order for the missed payments, except for the July 1996 non-payment.[1] On March 20, 1998, the court considered the contempt punishment for Katrina, and decided that jail time was not appropriate. The court then admonished Katrina to maintain a job, to keep Wayne advised of her work and living arrangements, and to notify Wayne of any change in circumstances. The trial court granted Katrina leniency at that time, because Katrina was employed (in a probationary period) as a poker dealer at Horseshoe Casino.
Katrina did not successfully complete her three month probationary period at Horseshoe Casino, and was terminated in May of 1998. She subsequently found occasional part-time work in TV production, and at the time of the 1999 hearing, was working for Michael Campisi on a part-time basis. Her work for Campisi consisted of helping him as a general assistant with lights, running the camera, directing and marketing.
The record additionally reveals that the State became involved in the collection of the past due arrearage as well as collection of the monthly child support obligation. The record indicates that a judgment in juvenile court was rendered against Katrina in 1996, and under that judgment, it appears that Katrina's wages were garnished by the State. Apparently, the amount garnished was one-half of Katrina's *515 income. Since Katrina was no longer earning $1,820 per month, the amount deducted was far below her obligation of $446 per month.
Katrina was unable to pay both her monthly child support obligation and the arrearage. By August 1998, Wayne filed a second rule for contempt against Katrina asserting a delinquent balance of $136.59 as of November 15, 1997 and non-payment of child support beginning June 8, 1998. In November 1998, Katrina answered this rule and filed a reconventional rule urging that she was entitled to a reduction in her obligation because one of the children had reached the age of majority in May 1998. Also, she asked that the court further modify the amount of her child support obligation based on her present income earning ability.
On June 9, 1999, the trial court held a hearing on both rules. At the hearing, the court heard testimony from Wayne and Katrina, as well as from Katrina's psychiatrist, Dr. Robin Rogers and Katrina's employer, Michael Campisi. Wayne, whose earnings were stipulated at $5,200 per month, testified that as of the date of the hearing, Katrina was behind $10,900.75 in child support payments.
Before allowing Katrina to testify, the court informed her of her Miranda rights.[2] Katrina, who was represented by counsel at the hearing, indicated that she understood her rights, and then went on to testify on her behalf. Katrina testified that she had been unable to pay her support obligation because of debilitating depression. Katrina said that she had a substance abuse problem with alcohol and admitted to using crack cocaine and marijuana (both of which she claims she used only on one occasion). Katrina testified that she has a masters degree in chemical dependency counseling from an unaccredited university. Additionally, Katrina testified that her prior $1,820 wage was grossly inflated for the amount of work required. She earned that wage in 1994 grading test papers for an unaccredited university. Katrina lost this job through no fault of her own when the establishment was forced to close.
Katrina stated that in May 1998, upon losing her job at Horseshoe (where she earned approximately $10-$12 per hour, depending on tips), she hospitalized herself for two weeks after a suicide attempt. After the hospitalization at LSU Medical Center, she spent two weeks in a detox center and then moved into a halfway house. She left the halfway house after ten days, because the program did not allow her to work. Katrina then moved into Oakwood, a home for women, until February 1999. She said that she tried to find work during this period, and that she had significant financial problems due to her unemployment. In February 1999, Katrina moved into another halfway house for about three weeks until she moved in with her fiancé. She testified that one weekend in April, 1999, her fiancé stole $1,150 from her and that she had him arrested. She also said that her fiancé took her food stamp card and used it to buy steaks to give to a drug dealer in exchange for drugs.[3] After this episode, Katrina again tried to commit suicide and was hospitalized for three days at LSU Medical Center. Upon leaving the hospital, Katrina again went to a halfway house to live.
*516 At the hearing, Katrina said that she had been working part-time for Michael Campisi doing television production work and earning about $200 per month. She was currently living in a halfway house, the Margaret Brown House, where her rent would soon be raised from $50 to $90 per week.
Campisi testified that Katrina was a good employee and that if his business grew, he planned to give her more responsibility in the future. He also stated that he was aware of her problems with depression and alcohol, and stated that he would not hold her problems against her.
Dr. Rogers testified that she met Katrina after her 1998 hospital stay. The doctor related that Katrina had twice before been hospitalized for psychological and substance abuse problems; once in 1991 and again in 1994. The doctor said that Katrina's treatment has included "ongoing" sessions with a social worker at the Shreveport Mental Health Clinic on a bi-monthly basis since May 1998. The social worker is supervised by Dr. Rogers. Dr. Rogers actually saw Katrina on four occasions: for her initial evaluation, as necessary to evaluate medications, and following hospitalization. Katrina was diagnosed by the doctor as having major depression, with alcoholism as a secondary and contributing factor. Katrina is also on medication for hypothyroidism.
The doctor opined that Katrina was not capable of holding a 9:00 a.m. to 5:00 p.m. job, due to her depression, and that Katrina was only capable of holding a job with significantly low stress levels, because of her personality disorder. Furthermore, Dr. Rogers stated that given Katrina's ongoing problems with depression, personality disorder, and substance abuse, she felt that Katrina's prognosis to return to 100 percent functioning was poor. Dr. Rogers also testified that she did not believe that Katrina was intentionally trying to remain a pauper. In fact, the doctor noted that every time Katrina had a relapse of her depression or substance abuse, she has gone out and attempted to find medical/psychiatric help and obtain work. In addition to and in support of Dr. Roger's testimony, the defense entered into evidence all of Katrina's medical records from LSU Medical Center.
After hearing the testimony, the district court found that Katrina was capable of working and earning a wage at her 1994 salary of $1,820 per month. Rejecting much of the testimony, the court found that Katrina had wilfully disobeyed the court's 1998 order requiring her to maintain employment and to pay child support. The court also concluded that: (i) Katrina's proposed depression defense was merely an "excuse;" (ii) there had not been sufficient attempts to get help for her alcohol abuse; (iii) the court was not impressed with the four doctor visits with Dr. Rogers; and (iv) Katrina was woefully underemployed. Furthermore, the trial court also specifically stated its belief that Dr. Rogers' impression and opinion "wasn't very persuasive." Later, the court found Katrina to be in contempt of court, in part, finding her "excuses" for nonpayment to be insufficient. The trial court concluded that Katrina could go to work "flipping burgers," and that no one was "forcing" Katrina to drink and use drugs.
On June 11, 1999, the court signed a judgment disposing of the rules. The court reduced Katrina's obligation effective November 1, 1998 from $446 per month to $398.70 per month based on one of the minor children reaching the age of majority. The trial court concluded that Katrina was voluntarily underemployed and imputed income to her in the amount previously earned by her in 1994. In addition, the court ruled that Katrina's arrearage of $3,671.71, plus interest, was due, exigible and susceptible of immediate execution. The court further awarded Wayne $1,876 in attorney fees. Additionally, on its own motion, the court suspended Katrina's drivers' license until the total arrearage of $9,669.65 was paid, with interest, in accordance *517 with La. R.S. 9:315.30.[4] Finally, the court found Katrina in contempt of court for failing to pay support and sentenced her to serve thirty days in jail. The trial court's judgment was suspended until this court rules on the merits of the writ application.
Katrina asserts as error the trial court's finding and sentencing her for contempt of court, the trial court's failure to further reduce her monthly child support obligation, and the trial court's decision to suspend her driver's license.

Discussion

Contempt of Court
In the recent case of Brown v. Taylor, 31,352 (La.App.2d Cir.2/26/99), 728 So.2d 1058, this court discussed the child support obligation as it relates to contempt of court:
"The support obligation imposed on a mother and a father of minor children by Art. 227 is firmly entrenched in our law and is a matter of public policy. State v. Reed, 26,896 (La.App.2d Cir.6/21/95), 658 So.2d 774. Neither equity nor practical inability to pay overrides this policy or allows a parent to avoid paying his or her share of the obligation where the inability arises solely from that parent's own neglect and failure. Id. at 777.
While the enforcement of the personal obligation to pay child support can be pursued through ordinary civil remedies by the parent to whom the obligation is owed, the law also expressly provides that "disobeying an order for the payment of child support" is a specific ground for which a court may hold a delinquent party in contempt of court. La. R.S. 13:4611(1)(d). In such delinquent child support settings, the court must determine that disobedience to the court's order for support is willful or a deliberate refusal by the parent to perform an act which was within the power of the parent to perform. See, La. C.C.P. art. 224(2) and La. R.S. 13:4611(1)(c)." (Emphasis added)
The general rule regarding failure to pay child support which results from an obligor's financial inability to pay was addressed by the court in Fontana v. Fontana, 426 So.2d 351 (La.App. 2d Cir.1983), writ denied, 433 So.2d 150 (La.1983) wherein the court stated that:
"as a general rule failure to pay alimony and child support resulting from the obligor's financial inability to pay ... cannot support a contempt charge."
However, the court in Brown, supra, after quoting the above language, added:
"Nevertheless, the court made clear that by examination of certain financial and other factors, such as, (1) the capacity of the parent for gainful employment immediately prior to the start of the contempt proceedings, (2) the living conditions and financial circumstances of the parent despite his unemployment, (3) the efforts to pay the delinquent alimony, and (4) proceedings to reduce or terminate the award based upon a change in the circumstances, the trial court can hold the parent in contempt."
The punishment imposed upon Katrina was unconditional and thus criminal, rather than civil, in nature.[5] In Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429-1430, 99 L.Ed.2d 721 (1988), the U.S. Supreme Court explicitly stated that criminal contempt must be proven "beyond a reasonable doubt." In the delinquent child support setting, the court must determine that disobedience to the court's order for support is wilful or a deliberate refusal by the parent to perform an act which was within *518 the power of the parent to perform. Brown, supra; See also, La. C.C.P. art. 224(2) and La. R.S. 13:4611(1)(c).
Katrina argues that Wayne did not meet this heavy burden in showing that her non-payment (and thus her violation of the court order) was either intentional or deliberate. We agree. When we consider only the evidence presented by Wayne, who prosecuted this criminal action against Katrina, his testimony revealed only the fact of nonpayment. Such fact standing alone does not establish a wilful or deliberate refusal to obey the court's order for support.
Additionally, when we consider Katrina's defense, she attempted to prove through her own testimony and the testimony of her psychiatrist that she suffers from major depression and that this condition, although being treated, nevertheless interferes with her ability to function. The two to three month delinquency for which Wayne brought contempt charges in August 1998 occurred during a period of time in which Katrina was hospitalized at LSU Medical Center and in a detox center.[6] Further, it is undisputed that following her hospitalization, Katrina lived in a halfway house during the summer of 1998 prior to the filing of Wayne's rule. Clearly, she was not putting her own comfort above that of her children.
The evidence shows that Katrina's work history over the past few years has been quite sporadic. Katrina did not work during most of her marriage to Wayne. The testimony adduced shows that she worked the last couple years of the marriage. In fact, the job that she had at the end of her marriage to Wayne was with an unaccredited university. She lost this job, through no fault of her own, when the university was closed. Also, as previously stated, Katrina was fired from her job at Horseshoe Casino.
Unlike the defendant in Brown, supra, who had no mental or physical condition that kept her from working, Katrina's mental condition and financial abilities were shown to be severely deficient. The testimony of Dr. Rogers, although not given much weight by the trial court, was uncontradicted. Furthermore, in support of Dr. Rogers' testimony are the medical records from LSU Medical Center that were entered into evidence without objection. Those records, which documented Katrina's condition before the contempt charges were ever brought, clearly show that Katrina suffered in the summer of 1998 from major depression, alcoholism, and hypothyroidism.
Accordingly, with Wayne presenting no evidence bearing on the wilfulness of Katrina's inaction at the trial of this contempt charge, and with the absence of other evidence disputing the medical and financial difficulties which disrupted Katrina's life, the trial court was manifestly wrong to completely ignore Katrina's defense against the charge of wilful disobedience of the court order. Therefore, the trial court's contempt ruling must be reversed, since the standard for imposing criminal punishment, beyond a reasonable doubt, was not met in Wayne's case-in-chief.
As we observed in Midyett v. Midyett, 32,208 (La.App.2d Cir.9/22/99), 744 So.2d 669, in contrast to a direct contempt which results in punishment primarily to vindicate the dignity of the court, constructive contempt for the family law matters recognized in La. R.S. 13:4611(1)(d) is punishable primarily to ensure the payment of child support for the best interest of the child. In such setting, a coercive civil remedy will better serve the interest of the aggrieved party and the best interest of *519 the child as opposed to unconditional jail time where earnings for payment of delinquent support payments are lost.

Reduction /Child Support Obligation
Katrina next argues that the reduction granted by the trial court was inadequate. The trial court adjusted Katrina's obligation of $446 per month to reflect that one child had become eighteen. Otherwise, the court attributed to her an $1,820 per month earning capacity based upon her former 1994 job. In making this ruling, the court again expressed its belief that Katrina's depression and alcohol abuse were being used as excuses for reducing the support obligation. Nevertheless, the court did indicate that the $1,820 figure was "fictional" income.
In Douthit v. Douthit, 31,713 (La.App.2d Cir.3/31/99), 732 So.2d 616, this court summarized the law on the changing of an award of child support:
"A child support obligation is subject to modification only when justified by the circumstances, and the party seeking the modification has the burden of proving that a change in circumstances has occurred since the fixing of the prior award. La. R.S. 9:311; McHale v. McHale, 612 So.2d 969 (La.App. 2d Cir. 1993); McKenna v. Steen, 422 So.2d 615 (La.App. 3d Cir.1982), writ denied, 429 So.2d 157 (La.1983); Hutto v. Kneipp, 627 So.2d 802 (La.App. 2d Cir.1993). However, proof of a change in circumstances does not justify the reduction where an obligor's inability to pay arises from his own voluntary actions. McHale v. McHale, supra; Hutto v. Kneipp, supra. A reduction of child support may be ordered on a showing by the party seeking the reduction that a change in circumstances has occurred; that the voluntary change of circumstances is reasonable and justified; that he or she is in good faith in not attempting to avoid his alimentary obligation; and his or her action will not deprive the child or children of continued reasonable financial support. Id. The trial court has wide discretion in determining credibility issues, and whether the obligor is in good faith in reducing his income is a factual determination which will not be disturbed absent an abuse of discretion. Havener v. Havener, [29,785 (La.App.2d Cir.8/20/97), 700 So.2d 533]; Gould v. Gould, [28,996 (La.App.2d Cir.1/24/97), 687 So.2d 685]."
Furthermore, La. R.S. 9:315.9 states in pertinent part:
"If a party is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of his or her income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years." (Emphasis ours)
This article was not mentioned specifically by the trial court in its oral reasons for judgment. From a review of this provision, the above jurisprudence and the facts of this case, we believe the trial court erred in the measurement of Katrina's income earning potential.
The evidence established that Katrina's loss of her $1,820 per month job caused a significant change in her financial circumstances which was involuntary and beyond her control. The rather unique and unusual nature of Katrina's former job is not reflective of earning capacity in the same manner that a job as a nurse, a lawyer, or a secretary implies specific job skills and training. The evidence further indicates that Katrina had little job experience, and most significantly, that her mental capacity will be a hindrance to her in returning to any job with a level of pay at $1,820 per month.
The record in this case contains sufficient information upon which to make a child support determination under the child support guidelines in La. R.S. 9:315, et seq. and a remand to the trial court is not necessary. Havener v. Havener, 29,785 (La.App.2d Cir.8/20/97), 700 So.2d 533. *520 Before the trial court and on application to this court, Katrina's counsel contends that her support obligation should be computed either on her present income of $200 per month, or in the alternative, the obligation should be computed based on the salary of a full-time employee earning minimum wage, $900 per month. Since Dr. Rogers testified that Katrina was capable of performing work and generating "some" income, we choose the $900 figure to compute the arrearage and set Katrina's new support obligation.
Based on Katrina's income potential of $900 and Wayne's stipulated income of $5,200, their combined monthly gross income is $6,100. Under La. R.S. 9:315.4, the basic child support obligation is $1,247.00. Using these figures, Katrina's portion of the basic child support obligation is now 15% or $187.50 per month. Therefore, the judgment of the trial court is hereby amended to reflect that Katrina's basic child support obligation as of November 1, 1998 is $187.50 per month.
Katrina also complains of the trial court's decision to prorate the insurance premiums paid by Wayne pursuant to La. R.S. 9:315(5).[7] She claims that insufficient evidence was presented to warrant use of the pro-rata approach as provided in La. R.S. 9:315(5). Katrina argues that La. R.S. 9:315(5)'s proration does not come into play until it is proven that the insurance policy in place is paid by way of a lump sum dependent coverage premium. This assignment lacks merit.
Wayne has supplied health insurance for himself, his new wife, and his two children. The premium is $319 per month. When asked whether he knew how much of that premium was paid to provide coverage for his children, Wayne stated that he did not know, but that he assumed that one-half of the premium was for his two children. Based on this lack of knowledge, Katrina would have us reduce the amount attributable to her alimentary obligation. However, we hold that the trial court's conclusion that Katrina pay a percentage of the amount paid for the children's insurance was not error. See, La. R.S. 9:315.4. Also, the trial court's ruling that the premium paid for the children should be calculated by proration was likewise appropriate. Therefore, Katrina's portion of the children's health insurance premium is calculated at 15% of $159.50, or $23.92.
From the above calculations, Katrina's monthly child support obligation is set at $211.42. Based on this new figure, the amount of arrearage due and exigible under Wayne's rule is $2,360.75. The judgment of the trial court is hereby amended to reflect these changes.

Suspension of Drivers' License
Katrina asserts that it was error for the trial court to suspend her drivers' license until all of the past due child support, plus interest, was paid in full. Brown, supra also addressed this issue. La. R.S. 9:315.30, et seq., allows the district court on its own motionto suspend the drivers' license of any individual not in compliance with a court order of child support. In Brown, the court recognized that this is a "last resort" measure designed to coerce a non-paying individual into compliance with the court's order and affirmed the suspension in that case in accordance with the contempt ruling.
Unlike contempt of court, the statute allows the court to suspend a license when the support obligor is more than ninety days in arrears in making payments in full for current support. La. R.S. 9:315.31(2) and 9:315.32(A). At the time of the June 1999 hearing, Katrina's arrearage *521 was shown to be in excess of ninety days. Therefore, we find that the trial court acted within its power to suspend her driver's license in this case.

Conclusion
For the foregoing reasons, the decision of the trial court regarding the contempt charge and jail time is hereby reversed. The decision of the trial court regarding reduction of the Katrina Lutke's monthly child support obligation is hereby reversed. It is hereby ordered, adjudged and decreed that effective November 1, 1998, the monthly child support obligation is set at $211.42, and the amount of arrearage owed to Wayne Lutke is $2,360.75. In all other respects, the trial court's judgment is affirmed. Costs of this appeal are to be paid by Katrina Lutke.
AFFIRMED IN PART, REVERSED IN PART AND AMENDED. THIS WRIT ORDER IS DESIGNATED FOR PUBLICATION.
NOTES
[1] The trial court, in its oral reasons for judgment, stated only that Katrina did not put on evidence to show that the July, 1996 nonpayment was beyond her control.
[2] The court stated that since Katrina could go to jail if found in contempt of court, she needed to be aware of her right not to incriminate herself. The court referenced our opinion of Brown v. Taylor, 31,352 (La.App.2d Cir.2/26/99), 728 So.2d 1058 as authority.
[3] Katrina testified that her fiancé relapsed on crack cocaine. In support of her testimony are the records from LSU Medical Center, wherein the admittance records indicate that Katrina told the medical staff that her fiancé stole her money and that he had relapsed on crack cocaine. Furthermore, we note that a drug screen performed on Katrina upon admittance into the hospital in April, 1999, was negative.
[4] This amount includes the judgment against Katrina for past arrearages rendered in 1997.
[5] The punishment imposed was "unconditional," because the trial court did not provide a stipulation that if Katrina paid the past due child support, she could "purge" herself of the contempt charge. See Brown, supra.
[6] The August 1998 rule to show cause for constructive contempt is governed by La. C.C.P. art. 225. That article requires that the rule "shall state the facts alleged to constitute the contempt." The jurisprudence holds that if the party is to be imprisoned for contempt, "it should be for acts antedating the issuing of the rule, not for acts arising subsequently to and pending the rule." Otillio v. Otillio, 119 La. 965, 969, 44 So. 799 (1907).
[7] La. R.S. 9:315(5) reads: "Health insurance premiums" means the actual amount paid by a party for providing health insurance on behalf of the child.... If more than one dependent is covered by health insurance which is paid through a lump-sum dependent-coverage premium, and not all of such dependents are the subject of the guidelines calculation, the cost of the coverage shall be prorated among the dependents covered before being applied to the guidelines.