821 So.2d 603 (2002)
Robert S. SAVAGE, Plaintiff-Appellant
v.
Martha Melzer SAVAGE, Defendant-Appellee.
No. 36,138-CA.
Court of Appeal of Louisiana, Second Circuit.
June 12, 2002.
*604 McLeod & Verlander, by Linda K. Ewbank, Monroe, for Plaintiff-Appellant.
Watson, McMillin & Harrison, by David C. McMillin, Monroe, for Defendant-Appellee.
Before NORRIS, CARAWAY and KOSTELKA, JJ.
NORRIS, Chief Judge.
The father, Robert G. ("Bob") Savage, appeals a judgment denying his rule to reduce a stipulated child support award of $750 a month for his 13-year-old daughter. He argues that the District Court improperly applied La. R.S. 9:311, regarding change in circumstances, made numerous unsupported factual findings, and should have reduced support to $114 a month. The mother, Martha Savage, argues that the court's findings were neither legally nor manifestly erroneous. For the reasons expressed, we affirm.

Factual background
Bob and Martha married in 1978. Their son Robert Jr. was born in 1982 (he is now a major and not involved in this suit); their daughter Annie was born in 1988. The parties physically separated in September 1996 and Bob filed for an Art. 102 divorce later that year. Martha was a teacher in the Monroe City School system, making $1,984 a month. Bob was, at the time, vice-president of Sunbelt Plastics, a corporation that made garbage bag liners. The record does not show his precise income, but based on the parties' 1995 tax return, he was making around $100,000 a year, including salary and bonuses.
By stipulated judgment on rule rendered December 12, 1996, Martha received domiciliary custody of both children, while Bob was to pay child support of $1,500 a month and maintain them on his company's medical and dental plan. The divorce became final in May 1997. Bob subsequently married Melissa, one of his co-workers at Sunbelt. In March 1999, Sunbelt was acquired by Tyco International, a large manufacturing corporation. At Tyco he was vice-president of institutional marketing.
Bob testified that on April 12, 1999 he was asked to resign because of a rumor that he was trying to start his own company. He admitted having "discussions" to that effect, but denied he intended to leave Tyco at that time. He resigned, taking a severance package but forfeiting a bonus of $32,000 that was anticipated in September. Melissa and another colleague, Billy Clark, also resigned.
Bob testified that there were no other positions in Northeast Louisiana comparable to his old one at Sunbelt. He explored *605 options in other companies, but he did not want to relocate to out of state. After talking with several of Tyco's competitors, he decided to start a new business making plastic sheets and bags. With his wife and Billy Clark, both former colleagues at Tyco, he formed Sapphire Plastics, incorporating in late April or early May 1999. Bob's parents have also made capital contributions to Sapphire.
Sapphire began operation in late 1999. Bob and Melissa own a majority (64%) of Sapphire's stock; Bob testified that he has infused $420,000 in start-up and operating funds. Although in 2000 Sapphire had gross sales of $768,000, the company showed a net loss of $335,974 (excluding depreciation). Bob testified that he has fixed his salary, as well as Melissa's, at $225 a week, about minimum wage, until the company can show a profit.
Bob filed the instant rule in January 2001. He alleged that when Robert Jr. turned 18, the parties agreed to reduce child support to $750 a month. But he claimed that this was still too much, since he lost his job at Tyco and Sapphire was not yet profitable enough to match his old salary. He argued that based on his current weekly salary of $225, and Martha's teaching salary, his support obligation should be reduced to $114 a month.
At trial in May 2001, only Bob and Martha testified. Bob described the circumstances of his separation from Tyco as "absolutely" beyond his control. He mentioned that some initial financial commitments "never came through," and recounted in some detail how he, his partners and his parents have capitalized Sapphire. He maintained that he has virtually depleted all his personal assets, including his Sunbelt/Tyco stock package, his Sunbelt/Tyco 401(k) plan, other stock he privately owned, and the proceeds of a second mortgage on his house, to put in $420,000. He has also called on his parents, who contributed over $200,000. Although he felt business was on the rise and Sapphire would turn a profit soon, he had to take various measures to assure cash flow, including minimal salaries of $225 a week for himself and Melissa.
Bob admitted, however, that he and Melissa were still living in a large home on the north side of Monroe; he still owns an airplane, a 1967 Cherokee Piper, on which he pays a monthly note and hangar rental; and despite his meager salary, he has managed to pay bills such as part of Robert Jr.'s tuition at Centenary College, a $1,000 pledge to the Boy Scouts of America, pool chemicals, country club dues, and a payment on Melissa's son's braces. On redirect, Bob offered explanations for most of these items. For example, he used the plane for business travel, as it was more economical than commercial flights. The hangar rental was essential to protect the plane from the elements, and with about $2,700 of repairs, the plane could be sold for $55,000. He stated that pool expenses were justified to spruce up the house for sale, although he has not actually placed the house on the market. He also testified that several large deposits (over $150,000 total) to his checking account in 2000 were actually capital contributions from his parents to Sapphire; these funds passed through his account but were not his income. He concluded that his current checkbook balance of $65,349 was "somewhat misleading."
Martha testified that her teacher's salary, with the "13th check," bonus and other stipends came to about $32,000 a year. She testified that she sold the parties' former marital home for $260,000 and bought a more modest home (in the same neighborhood) for $158,000. Her house note is $705 a month. She calculated expenses attributable solely to Annie at *606 about $5,100 a year, and sure to rise as she is now a teenager. She testified that child support of $750 a month was absolutely essential to keep them in their accustomed standard of living, but that Bob had been falling behind. She took the case to Child Support Services, which helped, but at the time of trial Bob was still two months in arrears.
In August 2001, the District Court recited oral reasons for judgment. It found that Bob established a change in circumstances, but that he had to resign from Tyco or else be fired for misconduct. "The evidence shows that the change in circumstances was caused by Mr. Savage's own fault; therefore he is not entitled to a reduction in child support." R.p. 237. The court then questioned whether Bob's decision to start his own business, "rather than pursuing other opportunities, is reasonable and justified and in good faith." R.p. 238. Based on Bob's 2000 W-2 from Sapphire, the court noted that his salary was actually $313 a week, not the $225 he testified about. The court found, "Mr. Savage's gamble in beginning a new business venture is not reasonable, particularly in light of his testimony that he rejected other employment opportunities in his field." R.p. 239. The court concluded that Bob was required to earn his true earning capacity, in light of his education and experience. It further found that Bob "has seized upon an opportunity to fix his own income and that of his wife in an effort to reduce child support payments." It noted that Sapphire was paying Billy Clark, a minority stockholder, almost four times as much as it pays Bob and Melissa. The court concluded that Bob has maintained the "same standard of living which he has always enjoyed," and rejected his testimony that he intended to sell the house and plane. R.pp. 240-241. All this, the court found, was inconsistent with his claim of a barely minimum wage salary. The court therefore dismissed his rule to reduce support.
Bob has appealed, advancing six assignments of error. The first two allege the District Court improperly applied the standard for finding a change in circumstances, as defined in R.S. 9:311 and explained in Hutto v. Kneipp, 25,321 (La.App. 2 Cir. 12/3/93), 627 So.2d 802. The remaining assignments address particular statements in the court's reasons for judgment which, according to Bob, are manifestly erroneous.

Applicable law
An award for support shall not be reduced unless the party seeking the reduction shows a material change in circumstances of one of the parties between the time of the previous award and the time of the motion to modify the award. La. R.S. 9:311 A. Not every change in circumstances warrants a reduction; Louisiana jurisprudence distinguishes between voluntary and involuntary changes in circumstances. Hutto v. Kneipp, supra, and citations therein. An involuntary change is one resulting from fortuitous events or other circumstances beyond that person's control, such as loss of one's position or illness. A voluntary act rendering it difficult or impossible to meet one's support obligation is not a ground for release, in whole or in part, from the obligation. Id.; Laiche v. Laiche, 237 La. 298, 111 So.2d 120 (1959).
A parent whose change in circumstances results from a voluntary termination of employment may still obtain a reduction in child support payments if he or she can show that (1) a change in circumstances occurred; (2) the voluntary change is reasonable and justified; (3) he or she is in good faith and not attempting to avoid the alimentary obligation; and (4) the action will not deprive the child of *607 continued reasonable financial support. Hutto v. Kneipp, supra; Lutke v. Lutke, 33,001 (La.App. 2 Cir. 2/1/00), 750 So.2d 512.
If a parent is voluntarily underemployed, child support shall be calculated based on his or her income earning potential. La. R.S. 9:315.9. Income includes potential income, if the party is voluntarily unemployed or underemployed. La. R.S. 9:315(6). A party is not deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment result through no fault or neglect of the party. Id.; Hutto v. Kneipp, supra; Koch v. Koch, 97-1600 (La.App. 4 Cir. 4/22/98), 714 So.2d 63.
In actions for reduction of child support, the district court has wide discretion to resolve credibility issues. Whether the obligor is in good faith in reducing his income is a factual determination which will not be disturbed absent an abuse of that discretion. Lutke v. Lutke, supra, and citations therein.

Discussion: Application of proper standard
By his first two assignments Bob urges the District Court erred in applying the wrong standard in determining whether the change in circumstances was voluntary or involuntary. Specifically, he contends that the court found the change in circumstances was the result of his "own fault," but that fault is not a legitimate factor in evaluating the change in circumstances. In support he cites R.S. 9:311, which does not mention the concept of fault, and Hutto v. Kneipp, supra.
This argument is technically correct in that proof of a change in circumstances under R.S. 9:311 does not entail a finding of fault. However, the District Court was analyzing a situation in which the obligor parent left a lucrative executive position and moved to a barely minimum wage job. Regardless of whether Bob's departure from Tyco was his "own fault," the court was entitled to question whether his low-paying replacement work was underemployment through his own fault or neglect. R.S. 9:315(6); Hutto v. Kneipp, supra. For this reason, we do not find that the court committed legal error or failed to apply the proper standard in analyzing the request for a reduction in support. The issue is whether the findings of fault and bad faith are within the District Court's broad discretion.

Manifest error issues
By his remaining assignments of error Bob urges there is no record support for the District Court's findings that (1) he "voluntarily" left his employment at Tyco; (2) his decision to start his own business, rather than pursuing other business opportunities, was unreasonable and in bad faith; (3) he "fixed" his own income to reduce his child support; and (4) he was enjoying the same lifestyle as he did when employed at Tyco. He contends that these instances of manifest error undermine the judgment and mandate a finding that he proved a change in circumstances.
The first claim of manifest error has merit. The only evidence that Bob's separation from Tyco was "voluntary" was his own description of "rumors," perhaps supported by his admission of "discussions," that he and other employees were trying to start a company; as a result, Tyco forced him either to resign or be terminated. Bob testified that he had no intention of leaving Tyco at that time. R.p. 101. There is no evidence to refute Bob's account of the incident or to show that he was guilty of any misconduct at Tyco; rumors of his plans merely hastened his departure. With no evidence of misconduct, a forced resignation is considered not a voluntary but an involuntary *608 discharge. Wood v. Louisiana Dept. of Employment Sec., 25,545 (La.App. 2 Cir. 2/23/94), 632 So.2d 899.
The other contested findings, however, have record support and are not plainly wrong. Bob testified that he earned an MBA from Vanderbilt University in 1980, and since that time he has been continuously employed by major corporations, usually advancing from a sales representative to a controller or vice-president. He left one company because he felt it was in bad financial straits. At the time of the divorce, his income was apparently close to $100,000 a year, and when he resigned from Tyco he lost a $32,000 bonus. In short, the record supports a conclusion that Bob is a well trained and competent business executive who had been continuously employed for 20 years and impressively agile in moving to more desirable corporate employment. Although he testified he could find nothing else in Northeast Louisiana comparable to his position at Tyco, the District Court was entitled to find that with his experience and credentials he could have done so, even if it meant relocating. Moreover, the record strongly suggests that Bob's plan, all along, was to start a new business. His resignation merely changed his timetable. On this record, we detect no manifest error.
Admittedly, in stating that Bob's decision to start a new business was not reasonable or in good faith, the court may have deprecated the significant strides that Sapphire has made in its first few years of operation. However, the record exposes serious questions about Bob's claim of drastically reduced personal finances. While he and Melissa each drew a salary of $225 a week, the court found that Billy Clark, who has only a 3.6% stake in the company, draws over four times as much. The record does not explain why the chief executive, controlling 64% of the company stock, could not receive a salary more commensurate with his position.
At the same time, Bob's cash flow statement showed that between January 2000 and April 2001, he deposited over $434,000 into his bank account, of which he transferred $298,100 to Sapphire. From the remaining $136,000, Bob made monthly payments on his airplane note and hangar rent, private college tuition, his stepson's braces, swimming pool upkeep, a donation to the Boy Scouts, and country club dues. He mentioned the possibility of selling the plane and the Northside home, but has taken no steps to do so. None of this would seem possible for a person genuinely reduced to a salary of $225 a week. In short, the record supports the District Court's finding that even after liquidating some of his sizeable assets and his adjusting some of his expenses, Bob's manner of life is inconsistent with a person who lives on minimum wage.
Finally, Bob did not testify that he minimized his salary for the purpose of skirting his child support obligation. However, viewing his bank account and cash flow statements, the District Court found that he had access to a substantial amount of money. He is in a position to set his own wage. In light of his positive cash flow statements for 2000 and 2001, and the fact that he has maintained several large expenses, we cannot say that the court was plainly wrong. The obligor parent's employment decision which results in a lower salary will not usually warrant a reduction in support. Douthit v. Douthit, 31,713 (La.App. 2 Cir. 3/31/99), 732 So.2d 616; Havener v. Havener, 29,785 (La.App. 2 Cir. 8/20/97), 700 So.2d 533; Hutto v. Kneipp, supra; Koch v. Koch, supra; McKenna v. Steen, 422 So.2d 615 (La.App. 3 Cir.1982), writ denied 429 So.2d 157 (La.1983).
In sum, the District Court was plainly wrong in one of the factual findings contested *609 on appeal. In all other respects, we find no manifest error. The record supports the findings that Bob placed himself in a position to be terminated from Tyco earlier than he planned; that he voluntarily undertook to start his own business rather than accept other employment; and that he used his sizeable assets to underwrite the new business and maintain his standard of living, all while neglecting to pay his child support. Simply put, he was voluntarily underemployed, with the result of denying his child reasonable financial support. For these reasons, the judgment will be affirmed.

Conclusion
For the reasons expressed, the judgment is AFFIRMED. Costs are assessed to the appellant, Robert S. Savage.
AFFIRMED.