848 So.2d 591 (2002)
Michael Lyndal CUROLE
v.
Grace Yin-Yee Wong CUROLE.
No. 02-CA-153.
Court of Appeal of Louisiana, Fifth Circuit.
June 26, 2002.
Writ Granted July 29, 2002.
*592 Mitchell F. Hoffman, Ellen Widen Kessler, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, LA and Lila Molaison Samuel, Gretna, LA, for Grace Yin-Yee Wong, Plaintiff-in-Rule/Appellant.
Lee W. Rand, New Orleans, LA, for Michael Lyndal Curole, Defendant-in-Rule/Appellee.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and SUSAN M. CHEHARDY.
*593 SUSAN M. CHEHARDY, Judge.
This is a child custody matter, in which the mother appeals a judgment that denied her request to relocate. We reverse and remand.
Grace Yin-Yee Wong Curole and Michael Lyndal Curole are parents of two children, ages six and two at the time of the proceeding in the trial court. The parents divorced in March 2001. They have joint custody of the children by consent judgment. Grace, the mother, is domiciliary parent. On October 10, 2000, Grace notified Michael that she wished to relocate with the children to Cleveland, Ohio. Michael filed an objection to relocation of the children.
After two days of hearing evidence, the trial court rendered judgment on August 25, 2001. The court denied the relocation proposal, finding that Grace did not prove by a preponderance of the evidence that the proposed relocation is in the best interest of the children and that application of the La.R.S. 9:355.12 criteria does not favor the proposed relocation. Grace appeals.
Grace seeks to relocate to Pepperpike, Ohio, which is in the Cleveland area, to participate in a business financed by her brother-in-law, Saul Seigel, husband of Grace's sister Ann. The business would import high-end Italian furniture to be sold at a sizeable markup to the large market in the Cleveland area, as well as over the Internet. Grace would earn an equity interest in the business as well as a salary of $50,000.00 per year and benefits.
Grace and the two children, Noelle and Evan, would initially live with her sister and brother-in-law, who own a very large home in an affluent area. Grace presented research showing the Cleveland area has excellent schools, medical facilities, and other amenities.
Grace stated the reasons for her desire to move are that it will be a better environment for her children and that she wants to start over and escape the strain of her relationship with Michael. She denied that she was trying to remove her children from contact with their father.
The evidence established that Grace and Michael had a long relationship prior to the births of their children and that their relationship was always stormy. There were many battles, occasionally physical. Prior to Evan's birth, on two occasions Grace left Michael and took Noelle with her for visits to Texas and California that lasted several months. On both occasions she returned and she and Michael reconciled. However, the strife between them continued. Grace and Michael separated for the last time in June 2000, after a physical altercation that left Grace with numerous bruises.
Grace worked for Southwest Airlines for 18 years prior to having her younger child, Evan, but she quit work to stay home with Evan when he became ill as an infant. Both Grace and Michael have been closely involved in parenting their children, although Grace has been the primary caretaker. Grace admitted she has not looked for work in the New Orleans area and acknowledged that she could probably get a good job in the New Orleans area because she is a hard worker and has extensive experience at Southwest Airlines.
Under the parties' visitation schedule, Michael is entitled to visitation with his children every weekend, with an extra day on alternating Fridays. Michael has exercised his visitation regularly and conscientiously. Following Grace's announcement of her desire to relocate and Michael's filing of his objection to the move, but prior to the trial, Michael began to experience difficulty in getting Noelle to come *594 with him for visitation. This became a major issue between the parents. Michael was convinced that Grace was encouraging Noelle to resist visiting with him; Grace was convinced that Michael was doing something to make Noelle not want to be with him.
There was an incident on May 26, 2001, when Noelle resisted going with her father so stubbornly that Michael called for police assistance, thinking an officer could help him enforce his visitation rights. The officer who arrived refused to take action because he found no criminal violations and the sheriff's office does not get involved in civil domestic matters.
After Grace decided she would like to relocate, she had Noelle evaluated by Dr. Amy Dickson, a clinical child psychologist, to ascertain whether such a move would affect Noelle adversely. Dr. Dickson advised her that Noelle seemed well-adjusted to the idea. Later, Dr. Dickson began seeing Noelle in therapy sessions after Noelle began manifesting reluctance to visit with her father.
At trial Dr. Dickson testified as Noelle's treating therapist. Dr. Dickson felt the relocation would not be detrimental to Noelle, would be positive in her development, and in her best interest.
Grace drafted a relocation proposal, as required by La.R.S. 9:355.4(B)(5). In it she offered to pay for roundtrip airfare for Michael to fly to Cleveland every other weekend (26 visits) to visit the children, as well as other visitation periods of longer duration during the first year after the relocation.
Dr. Karen Van Beyer, appointed by the court to perform a custody evaluation, was the only one of the three experts testifying at trial who had interviewed all parties to the case. Dr. Van Beyer testified that she interviewed the parents together and individually and she interviewed Noelle individually, but did not interview Evan individually because of his young age. She also talked to family members of both parents. She noted that she has been involved in relocation cases since the Ramos case[1] and this was the first time she felt a move would be in the children's best interest.
Dr. Van Beyer stated the conflict between Grace and Michael arises out of both their contrasting personalities and different cultural upbringing. She described Grace as "sensitive and emotionally reactive"; she described Michael as someone "convinced of the correctness of his own opinions," who "tends to hold forth on those opinions quite assertively and sometimes aggressively." Michael sees Grace as overly emotional and overly excitable; Grace regards Michael's aggressiveness as being badgering, belittling, and critical.
Dr. Van Beyer noted that Grace comes from an Asian culture and grew up with beliefs that in some respects are alien to Michael's cultural beliefs. (Specifically, Dr. Van Beyer referred to Grace's belief in numerology, the practice of feng shui, the ghosts of ancestors, and that malignant spirits can infest objects.) Her adherence to these beliefs has been another source of conflict between her and Michael, to the extent that Michael insisted Grace see a therapist, Dr. Blocker, because of her beliefs and her emotionality. Dr. Van Beyer noted, however, that these are marital issues rather than "one party versus the other being insane." She felt that these *595 beliefs are not abnormal for a person brought up in an Asian culture.
Dr. Van Beyer said there is nothing in Grace's family history that would cause the doctor concern about Grace being the primary custodial parent with the children in Ohio. She admitted, also, that she found nothing in Michael's family history that would contribute to the move as being in the best interest of the children.
Dr. Van Beyer based her recommendation of the move on the high level of conflict between the parents, which is not just secondary to their divorce but goes back throughout the marriage. She testified that the conflict between the parents is very detrimental to the children's well-being. Relocation would be beneficial by lessening the contact between the parents and, thus, reducing the extreme amount of conflict between them. She noted that Noelle is in danger of becoming alienated from her father because of her sensitivity to her parents' issues. The child feels protective of her mother and has come to feel that her father is mean to her mother.
Dr. Van Beyer noted that Michael's calling the police when Noelle refused to go on visitation with him subjected the child to the high degree of conflict between the two parents, which is very frightening for the child, and psychologically damaging. Dr. Van Beyer stated that action confirmed her opinion that Michael needs anger management therapy. Dr. Van Beyer stated that permitting the move to Cleveland would alleviate the triangulation of Noelle into the conflict between her parents.
Dr. Van Beyer stated that at present neither parent was doing a good job of supporting the children's relationship with the other parent. She recommended that the parents attend Voices of Children co-parenting seminars. She noted that unless these parents go through "a lot of therapy" and make a lot of changes, they are not going to be able to get along well with each other if they're in the same city. She stated they have a long pattern of conflict about deeply-held personal beliefs, their conflict resolution patterns are very dysfunctional, and she does not think they are going to get over it.
Dr. Van Beyer also noted that the children see their paternal grandparents frequently and have a close, loving relationship with them. However the children's primary relationship is with their parents and that is what affects them most. The doctor noted that if there were no conflict between the parents, it would be preferable for the children to live here rather than move to Ohio.
Dr. Van Beyer recommended modification to Grace's proposal that would give Noelle longer extended periods of time with her father on a less-frequent basis. Dr. Van Beyer felt that although Evan was only two, monthly visits, with longer visits on holidays and in summer, could sustain his attachment with his father.
There was testimony from Grace, Dr. Dickson, and Dr. Van Beyer about an incident reported by Noelle. Noelle told Dr. Dickson that during one of her visits with her father, he lost his temper. He allegedly shook and "head-butted" Noelle because she interrupted him while he was working at his computer.
Two of Grace's sisters testified. Ann, the sister in Ohio, testified she and her husband are willing to provide Grace and the children with a place to live, as well as a social and financial support system, until they get on their feet. Eve, one of Grace's sisters who lives in the New Orleans area, testified she and her other sisters are all close to Grace and believe the move would be a good thing for her and the children.
*596 Michael Curole testified that Grace impedes his visitation with his children by "holding on" to Noelle, with the result that Noelle will not leave as long as her mother is hugging her. He stated he did not call the police on Noelle, but called for assistance in enforcing his visitation rights. He denied telling the police officer to forcibly remove Noelle and place her in his car. He admitted that calling the police was a bad idea, but said he felt he was out of options. He did not feel Noelle was traumatized by the incident with the police officer or even seriously upset.[2]
With regard to the so-called "head-butting" incident, Michael admitted he "grabbed" Noelle, but denied that he head-butted his daughter. He said she did get a spanking that weekend, but it was because she "terrorized" her little brother on the playground at a fast-food restaurant.
Michael also denied that he bullied, beat, or physically attacked Grace during their marriage. He stated the bruises shown on her in the photographs in evidence were offensive rather than defensive injuries because she lost her temper and attacked him. He said she was "back-handing" and "fore-handing" him.[3] Michael did not believe his behavior had been out-of-line at all and stated he does not need anger management therapy.
Michael feared that with his children in Ohio, the amount of time they would be separated will result in their becoming unfamiliar with him and uncomfortable when they see him. He felt the basic conflict between him and Grace just arose due to the legal system in preparation for the trial; he felt that once the court made a decision the conflict would "go down considerably."
He admitted that he has told Grace, in front of Noelle, that she should punish Noelle for refusing to go to visitation with him. He feels that Noelle sometimes is "playing the crowd" and "having fun," "playing games" during these times. He stated that Noelle becomes "an absolutely different child" once they have driven away from her mother's home.
Michael's parents, the children's paternal grandparents, and Michael's brother, David, testified to the closeness of their family ties, their loving relationship with the children, their frequent contacts with the children, and their desire to have the children remain in New Orleans in order to sustain the relationships.
Dr. Lynn Parker, a clinical child psychologist, was called as a witness by Michael as an expert on the general effect of young children being separated from their parents post-divorce. Dr. Parker stated she could not testify specifically as to the effect on Noelle and Evan; although she had met with both Grace and Michael, she had not done an evaluation of the children in this case. She said it would not be *597 appropriate for her to testify about them. Counsel for Grace objected to Dr. Parker's competence to testify under the Daubert criteria, but the objection was overruled by the court.[4]
Dr. Parker stated she does not recommend relocation for small children, who need frequent and usually briefer contact with their parents. She said that lengthy periods between visits usually are insufficient to maintain a healthy parent-child relationship. She said that when there is visitation across state lines, parents usually stick to the schedule in the first year due to high guilt about the divorce. Eventually, however, the children suffer because the parent who is traveling to see themusually the fatherstops having as much contact. The father finds it's too painful because visitation must take place in an artificial situation, such as a hotel room, and is just to have contact rather than to co-parent. The father is not involved with friends or with the children's school and the children gradually stop wanting to come for visitation. The travel is arduous for the children. Over the years the relationships weaken and are adversely affected.
Dr. Parker admitted that there is literature showing that if a child is in a very high conflict situation for long periods, getting the child out of the conflict is important. However, she stated, she has never recommended relocation and doubts she ever will recommend it where there are very young children. Instead, she advises intervention to decrease the conflict, with the parents living in close proximity, rather than attempting to avoid the conflict by a move that does not really resolve it. Dr. Parker felt the best way to resolve conflicts is to have a court-appointed family therapist who sees the parties together, rather than dividing up the task between people who do not talk to one another.
La.R.S. 9:355.1-9:355.17 govern relocation issues in child custody cases. The relocating parent has the burden of proving that the proposed relocation is made in good faith and is in the best interest of the children. La.R.S. 9:355.13. In deciding a contested relocation request, the trial judge must consider the factors set out in La.R.S. 9:355.12. If the court grants authorization to relocate, the court may retain continuing, exclusive jurisdiction of the case after relocation of the child, as long as the non-relocating parent remains in the state. La.R.S. 9:355.17.
In written reasons for judgment, the court found that Grace's relocation proposal was made in good faith. The court listed and discussed each of the factors set out in La.R.S. 9:355.12 to determine contested relocation, as follows:
1. La.R.S. 9:355.12(1): "The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent, siblings, and other significant persons in the child's life." The court found that the diminished relationship the children would have with their father and paternal grandparents weighs heavily against relocation.
2. La.R.S. 9:355.12(2): "The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child." The court found that the probable injury to the children's development and relationship with their father weighs against relocation.
*598 3. La.R.S. 9:355.12(3): "The feasibility of preserving the relationship between the non-relocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties." The court found that the feasibility of preserving the relationship between the father and the children is remote if relocation is permitted and the difficulty of long-distance transitions for visitation would certainly have an adverse impact on the preservation of the children's relationship with their father, weighing heavily against relocation.
4. La.R.S. 9:355.12(4): "The child's preference, taking into consideration the age and maturity of the child." The court gave no weight to this factor because the children are too young to consider their preferences.
5. La.R.S. 9:355.12(5): "Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the non-relocating party." The court found that the mother has exhibited a subtle course of conduct that, intentionally or unintentionally, discourages consistent and healthy visits of the children, particularly Noelle, with their father, which weighs "clearly and heavily" against relocation.
6. La.R.S. 9:355.12(6): "Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity." The court found that relocation to Cleveland will enhance the quality of life for both the mother and the children because it is safe, has better schools and recreation to offer, and the mother anticipates a good career there, all of which favor relocation.
7. La.R.S. 9:355.12(7): "The reasons of each parent for seeking or opposing the relocation." The court found that the mother's primary reason for wanting to move is to avail herself of a promising, although not certain, business opportunity, but there is no reason to believe her eventual permanent residence there will be "so significantly better than Metairie" as to justify relocating the children so far from their father. The court found that father's reasons for opposing the relocation are that he does not want to lose frequent contact with his children and he fears alienation from them, which the court found reasonable.
The court stated,
The court is convinced that this move, if permitted, would lead to the nearly complete deterioration of Michael's close relationship with Evan, and of a potentially equally close relationship with Noelle, which outweighs the benefits of relocation.
If the children remain here, with cooperation from Grace, they can enjoy a healthy relationship with both parents and grandparents. While there are significant immediate benefits to moving, they are outweighed by the long-term detrimental effects on the children and the alienation of their father and paternal grandparents.
8. La.R.S. 9:355.12(8): "Any other factors affecting the best interest of the child." The court noted it was "very impressed with the testimony and credentials of Dr. Lynn Parker"and that Dr. Parker "testified emphatically that she thought that this relocation is unhealthy for the children." The court cited testimony (from Grace) that Michael's temper had improved in recent months and that Grace had been heard by neighbors (Rafael Miranda and William Sturm) to yell and scream at the children and at Michael, when the parents were still living together. Finally the court found the testimony of *599 the mother's expert witness, Amy Dickson, Ph.D., to be "very, very biased and somewhat defensive on cross-examination....She clearly was there to be favorable to Grace."
The trial judge ultimately concluded:
Grace clearly is a wonderful mother, and the court does not doubt that the community she wants to move her children to will be, at least initially, superior. But that is only one of many factors which the law requires this court to consider. As mover, Grace bears the difficult burden of proving that this relocation, a dramatic change in living arrangements, is in the best interest of the children according to the numerous factors above. Although there are certainly benefits to this relocation proposal, having applied these factors, the court is convinced that relocation is not in the children's best interest, and the relocation must therefore be denied.
On appeal, Grace asserts that the trial court misunderstood or mischaracterized the evidence and disregarded the testimony of the court-appointed expert. Grace contends the judge erred because he found she was in good faith about the move, had good reason to relocate, and that the proposed business opportunity was real and viable, yet he denied her relocation request. She asserts the trial court's characterization of her was clearly unreasonable based on all the evidence. She argues that the court's findings are self-contradictory because he said she is a wonderful mother, yet he also stated that she causes the transition problems and that she could prevent them. She opposes the court's characterization of her in that statement, as well as in other comments.
In addition, she contends his characterization of Michael and his behavior is contradicted by the evidence and the record. She states the court ignored, discounted and even contradicted more damaging evidence about Michael, by dismissing his anger, aggression and poor judgment as mere "occasional temper and impetuousness." She also pointed to Michael's denial that he is in need of anger management training, despite Dr. Van Beyer's recommendation of it.
Grace contends the trial court committed "stigmatizing error" that led to unreasonable conclusions and resulted in injustice.
Grace also asserts that "the judge unreasonably disregarded the recommendations and reasons of the Court-appointed evaluator, despite corroborating evidence of her findings and even though she was the only unbiased witness who knew and evaluated both parents, the children, and the extended families."
Because Dr. Van Beyer was appointed as the court's own expert, Grace argues the trial court erred in rejecting her recommendation the relocation should be permitted. Grace contends that not only was Van Beyer appointed by the court, but also she was the only expert who had interviewed all the concerned parties. Grace asserts that it was unreasonable of the court to accept only part of her findings and reject almost all others.
Further, Grace argues,
The judge unreasonably allowed the court appointed mediator, who hardly knew Grace and had never met the children, to testify about the effects of the move; his erroneous deference to her theoretical opinions was compounded by his failure to require any professional therapy in his judgment, especially for Michael Curole.
We note, first, that although Grace points out on appeal that Dr. Parker briefly served as a court-appointed mediator earlier in this case (on a conflict about whether Evan should have overnight visitation with Michael), at trial Grace's counsel failed to object to Dr. Parker's testimony *600 on the ground that she had served as mediator. Rather, counsel objected that Dr. Parker did not satisfy the Daubert standards to qualify as an expert in this matter.
The trial judge stated he was impressed with Dr. Parker, accepted her general testimony about the effects on small children of post-divorce separation from parents, and noted her opinion that living away from their father is "almost certain" to injure the children's relationship with him.
After weighing and evaluating medical and lay testimony, the trial court may accept or reject the opinion expressed by any medical expert. Goodwin v. Goodwin, 618 So.2d 579, 586 (La.App. 2 Cir. 1993). The trial judge has the discretion to substitute his common sense and judgment when such a substitution appears warranted upon the record as a whole. Goodwin, 618 So.2d at 586; Lloyd v. TG & Y Stores Co., 556 So.2d 629, 636 (La.App. 2d Cir.1990). However, the weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based. Lloyd, 556 So.2d at 636.
We agree with Grace. The trial court erred in failing to give weight to the testimony of Dr. Van Beyer, who had been appointed by the court and who had interviewed all persons involved in the matter. The court erroneously stated, in the written Reasons for Judgment, "No independent mental health expert was appointed by the court to perform evaluations pursuant to R.S. 9:355.8 B."
Instead, the court relied on the testimony of Dr. Parker, who could not testify specifically as to the parties in this case, but only generally as to the effects of relocation in custody situations. That was both error by the judge and an abuse of the court's discretion. Dr. Parker's testimony, which could only be general, should not have been given greater credence than that the testimony of Dr. Van Beyer. Dr. Van Beyer had been appointed by the court, her testimony was specific, and her recommendation was based on in-depth evaluation of the individuals involved.
Finally, Grace contends that the trial court's conclusions are inconsistent with the facts and the record. Specifically, she asserts that the statutory criteria of La. R.S. 9:355.12 are inapplicable to this case and that the analysis is erroneous and clearly wrong.
Grace argues that La.R.S. 9:355.12 should not have been applied here because there was a restraining order in effect.[5] She argues that the pre-enactment standards should have been applied, which merely require proof by the parent seeking permission to relocate that there is "good reason for the move and that the move is in the children's best interest." Stewart v. Stewart, 525 So.2d 218, 223 (La.App. 1 Cir. 4/19/88). She argues that, under these standards, the trial court's findings that Grace has been offered a legitimate business opportunity and is in good faith in contending she could provide a better home for the children would require granting of Grace's request to relocate.
Grace admits, however, that even if the criteria of La.R.S. 9:355.12 do not apply here, the court's analysis based on those factors would not necessarily be reversible *601 error, except that the court in this case relied on "uncorroborated conclusions," "improper inferences," and "distortion of the record" to support his decision.
The parties both initially obtained temporary restraining orders preventing each from abusing or harassing the other. The order in favor of Michael was issued on June 14, 2000; the order in favor of Grace was issued on July 5, 2000. On July 17, 2000, a consent judgment issued modifying the temporary restraining order issued on June 14, 2000, to prohibit Grace and Michael mutually from removing the children from Louisiana on a permanent basis without complying with the Louisiana statute on relocation. The modification was approved and signed by counsel for both parties. Accordingly, there is no merit to Grace's argument that the custody relocation statutes do not apply.
An appellate court may not set aside a trial court's finding of fact absent manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). A child custody matter must be viewed within the context of its own particular set of facts. A trial court's determination in such matters is entitled to great weight and will not be overturned on appeal absent a clear showing of abuse of discretion. Connelly v. Connelly, 94-0527, pp. 4-5 (La.App. 1st Cir.1994), 644 So.2d 789, 793. The primary consideration and prevailing inquiry is whether a custody arrangement is in the best interest of the child. Deason v. Deason, 99-1811, p. 6 (La.App. 3 Cir. 4/5/00), 759 So.2d 219, 222.
The weight to be given expert testimony depends, ultimately, on the facts on which it is based, as well as the professional qualifications and experience of the expert. Meany v. Meany, 94-0251, p. 11 (La.7/5/94), 639 So.2d 229, 236. For an expert opinion to be valid and merit much weight, the facts upon which it is based must be substantiated by the record; if the facts are not substantiated by the record, the trial court may reject the opinion. Gould v. Gould, 28,996, p. 7 (La.App. 2 Cir. 1/24/97), 687 So.2d 685, 690.
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable. Theriot v. Lasseigne, 640 So.2d 1305, 1310 (La. 1994).
In the lengthy reasons for judgment, the trial court addressed each relevant factor of La.R.S. 9:355.12 before concluding that the proposed relocation was not in the best interest of the children. See Franklin v. Franklin, 99 1738, p. 7 (La.App.5/24/00), 763 So.2d 759, 763. However, the judge made several misstatements of fact.[6] Further, the reasons are internally contradictory.
Because the trial judge is in a better position to evaluate the best interest of a child from his observance of the parties and the witnesses, his decision should not be disturbed on review absent a clear showing of abuse. State in the Interest of Sylvester, 525 So.2d 604, 608 (La. App. 3 Cir.1988); Deason v. Deason, 99-1811, p. 2 (La.App. 3 Cir. 4./5/00), 759 So.2d 219, 220; Brisbois v. Brisbois, 00-203, p. 11 (La.App. 5 Cir. 8/29/00), 767 So.2d 887, 893.
The weight which is to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the *602 opinion is based. The trial judge also has the discretion to substitute his common sense and judgment when such a substitution appears warranted upon the record as a whole. [Citations omitted.]
Ramos v. Ramos, 97-143, p. 4 (La.App. 5 Cir. 6/2/97), 697 So.2d 280, 283.
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990).
We conclude, looking at the record as a whole, that the trial judge clearly abused his discretion. He should have given weight to Dr. Van Beyer's recommendationwhich was specific to the parties to this case and based on direct evaluation of themover Dr. Parker's recommendationwhich was non-specific to these parties and based on general theories rather than direct evaluation of these parties.
Reviewing the issue of the children's best interest, we conclude the evidence and testimony support that it is in the children's best interest to allow their mother to relocate to Ohio as she has requested. The friction and conflict between the parties will thereby be reduced to a minimum, yet the children would be able to continue to have frequent and extensive visitation with their father under the plan developed by Grace, as modified by Dr. Van Beyer's suggestions. Accordingly, we reverse the trial court's ruling.
We also find merit in Grace's argument that the trial court erred in following Dr. Parker's recommendation against relocation, while ignoring Dr. Parker's recommendation that there be intervention or family therapy toward resolving the parental conflict. It is clear that this family is in dire need of counseling and guidance. Therefore, we remand for the trial court to provide appropriate instructions for therapeutic family counseling for the parties.
For the foregoing reasons, the judgment of the district court is reversed. Grace Wong Curole's request to relocate is granted and it is ordered that the relocation proposal prepared by Grace be implemented with the changes suggested by Dr. Van Beyer. The matter is remanded and the trial court is ordered to provide for family counseling for the parties as indicated by both Dr. Van Beyer and Dr. Parker. The appellee, Michael Lyndal Curole, is cast for costs of this appeal.
REVERSED AND REMANDED.
NOTES
[1] Ramos v. Ramos, 97-143 (La.App. 5 Cir. 6/2/97), 697 So.2d 280, writ denied, 97-1770 (La.9/19/97), 701 So.2d 176.
[2] In contrast, the police officer who came out on the call, Deputy Stephen Caravella, testified that he asked Michael if he expected the deputy to take his daughter and physically place her in Michael's car. Caravella said Michael replied yes, because if he did it they would say he was abusing his child. Caravella then told Michael that he could see no violation of the law, so it was not a police matter. Michael then asked Caravella to write a police report on the incident stating that his wife refused to allow his daughter to see him. Caravella said that Grace was upset but cooperative while he was on the scene and that she did not appear to him to be keeping Noelle from going with her father. Rather, Grace was trying to get her daughter to go, but the child apparently just did not want to go.
[3] Asked by Grace's attorney to describe their relative sizes, Michael said that he weighs 170 pounds and is five feet ten inches tall, while Grace weighs 110 pounds and is five feet four-and-one-half inches tall.
[4] Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), sets out the factors a trial judge must consider as "gatekeeper" for admission of expert evidence.
[5] La.R.S. 9:355.2(C)(2) states that the provisions of Title 9, Ch. 1, Part III, Subpart E ("Relocating a Child's Residence")i.e., La. R.S. 9:355.1 through 9:355.17 shall not apply when an order pursuant to Domestic Abuse Assistance, Post-Separation Family Violence Relief Act, or any other restraining order, injunction or protective order prohibiting a spouse from harming or going near or in the proximity of the other spouse is in effect.
[6] For example, he erroneously stated that no independent expert had been appointed by the court to evaluate custody. Further, he stated that Grace had been a flight attendant, an apparent misunderstanding derived from her statement that she had worked for an airline.